**Carl GALLOWAY, Petitioner,**

v.

**FEDERAL COMMUNICATIONS COMMISSION and United States of America, Respondents,**

**CBS, Inc., Intervenor.**

**No. 84–1346.**

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 19, 1985.

Decided Dec. 6, 1985.

John D. Hemenway, Washington, D.C., for petitioner.

C. Grey Pash, Counsel, F.C.C., with whom J. Paul McGrath, Asst. Atty. Gen., Jack D. Smith, Gen. Counsel, and Daniel M. Armstrong, Associate Gen. Counsel, F.C.C., and John G. Powers, III and Margaret G. Halpern, Attys. Dept. of Justice, Washington, D.C., were on brief, for respondents.

J. Roger Wollenberg, with whom Joel Rosenbloom, Neal T. Kilminster, and John W. Zucker, Washington, D.C., were on brief, for intervenor.

---

* Of the United States Court of Appeals for the Federal Circuit, sitting by designation pursuant to 28 U.S.C. § 291(a) (1982).

Before J. SKELLY WRIGHT, MIKVA and FRIEDMAN,* Circuit Judges.

Opinion for the court filed by Circuit Judge J. SKELLY WRIGHT.

J. SKELLY WRIGHT, Circuit Judge.

Petitioner Carl Galloway, who was mentioned during a CBS News broadcast about insurance fraud, complained to the Federal Communications Commission that the broadcast had violated both the Commission's Personal Attack rule and its policy against deliberate news distortion. Petitioner asked the Commission to revoke the licenses of intervenor CBS's owned-and-operated stations. The Commission denied Galloway's request and he appeals to this court, challenging both the policies and their application. Because petitioner has failed to make the necessary showings on either his personal attack or deliberate distortion complaint, we affirm the Commission's ruling.

I. BACKGROUND

On December 9, 1979 the CBS News program *60 Minutes* broadcast a story entitled "It's No Accident," about an allegedly widespread fraudulent insurance scheme. According to the program, doctors, lawyers and "victims" would conspire to submit reports of accidents that had never occurred (or were greatly exaggerated) and submit bills for medical treatment that had never been rendered. The program said that such schemes cost insurers more than $1 billion a year, that much of the cost was passed on to honest policyholders in the form of higher premiums, and that the insurance companies were not as vigorous as they might be in investigating fraudulent claims "because it's cheaper to settle than to investigate." *Broadcast Transcript* at 2, *reprinted in* Joint Appendix (JA) at 32.

In the course of preparing the broadcast CBS sent an insurance investigator to a clinic suspected of participating in the fraudulent schemes. "[She] was instructed to tell the clinic that one month earlier she had been in a minor accident, had not been hurt, but needed back-dated full medical bills as the basis for an insurance claim." *Id.* at 7, JA 37. She received a bill listing 19 visits that never occurred for treatment that was never administered. In describing that bill CBS Correspondent Dan Rather said, "It was signed by Carl A. Galloway, M.D." *Id.* Although the clinic figured prominently in the broadcast, no other mention was made of Galloway.

Galloway sued CBS for libel in the state courts of California, claiming that his name had been forged on the fraudulent bill. Galloway lost at trial on a general jury verdict that is currently the subject of a separate appeal in the California courts. During discovery for the libel suit Galloway received a great deal of information, including film or tape that was shot for the broadcast but never aired ("outtakes"). This material formed the basis of his complaint to the FCC.

Galloway's FCC complaint alleged two separate violations by CBS. First, he said he had been the victim of a personal attack and had been denied an opportunity to reply. Second, he said that CBS "violated Commission policy by deliberately distorting, slanting, falsifying and staging" the broadcast at issue. *Complaint* at 1, JA 1. We will consider these two issues separately.

II. THE PERSONAL ATTACK COMPLAINT

 The Personal Attack rule, 47 C.F.R. § 73.1920 (1984), is the component of the Fairness Doctrine that requires licensees to provide notice and an opportunity to reply whenever "during the presentation of views on a controversial issue of

public importance, an attack is made upon the honesty, character, integrity or like personal qualities of an identified person or group." [1] The general Fairness Doctrine imposes an obligation on broadcasters to present opposing points of view, but the licensee may select the person or method of presenting those views; the Personal Attack rule designates the persons attacked as "natural opposing spokesmen" and gives them the personal right of reply. *In the Matter of the Handling of Public Issues Under the Fairness Doctrine and the Public Interest Standards of the Communications Act,* 48 FCC2d 1, 16 (1974), *reconsid. denied,* 58 FCC2d 691 (1976), *aff'd in part and remanded in part sub nom. National Citizens Committee for Broadcasting v. FCC,* 567 F.2d 1095 (D.C.Cir. 1977), *cert. denied,* 436 U.S. 926, 98 S.Ct. 2820, 56 L.Ed.2d 769 (1978) (hereinafter *Fairness Report* ). As a corollary of the general Fairness Doctrine, the rule is intended to insure that the public is informed about important issues; it is not intended to air private disputes or to serve as a substitute for defamation actions. *Healey v. FCC,* 460 F.2d 917, 922–923 (D.C.Cir. 1972); *CIA v. American Broadcasting Co.,* Mass Media Bureau Mimeo No. 1862, para. 12 n. 9 (Jan. 10, 1985); *Fairness Report,* 48 FCC2d at 12 n. 11; *Personal Attacks,* 8 FCC2d 721, 722, 725 (1967). The limited scope of the rule is consistent with the principles of the First Amendment and congressional intent to allow licensees the maximum editorial freedom consistent with their role as public trustees. *See Strauss Communications, Inc. v. FCC,* 530 F.2d 1001, 1008 (D.C.Cir.1976).

It is not disputed that the allegation of insurance fraud constitutes an "attack * * upon the honesty, character, integrity or like personal qualities" of Dr. Galloway. The only issue is whether this attack occurred "during the presentation of views on a controversial issue of public impor-

---

1. There is an exemption to the rule for "bona fide newscasts, bona fide news interviews, and on the spot coverage of bona fide news events," 47 C.F.R. § 73.1930(a)(4) (1984), but *60 Minutes* has been held to be a "documentary" rather

than an interview program, and consequently subject to the Personal Attack rule. *In re Complaints of Avery Post, et al.,* 97 FCC2d 433, 435 (1984).

tance." The Commission determines separately whether an issue is controversial and whether it is of public importance. Controversy, which the Commission considers the more objective determination, depends on "the degree of attention paid to an issue by government officials, community leaders and the media," and whether it is "the subject of vigorous debate with substantial elements of the community in opposition to one another." *Fairness Report*, 48 FCC2d at 12. "The principal test of public importance, however, is not the extent of media or government attention, but rather a selective evaluation of the impact the issue is likely to have on the community at large." *Id.* Newsworthiness alone is not the touchstone of public importance. *Healey v. FCC, supra*, 460 F.2d at 922.

In his original complaint Galloway characterized the controversial issues here as "(1) phony insurance claims stemming from fraudulent automobile accidents and (2) insurance companies response to those claims." *Complaint*, JA 26. The Commission found that Galloway had "furnished no information which shows that the 'It's No Accident' program involved an issue which met the required standard." *In re Complaint of Carl Galloway*, Staff Ruling (Feb. 3, 1984) at 8, JA 322 (hereinafter Staff Ruling). Although Galloway alleged that increases in insurance rates "have been the subject of vigorous debate among substantial elements of the community in opposition to one another," *Complaint*, JA 27, he provided no evidence of that debate. Instead, his initial complaint merely said, "The amount of material generated by this debate is too voluminous to present. A quick perusal through any index to the Congressional Record or Reader's Guide to periodicals will clearly show the intensity and scope of this debate." *Id.* The burden of establishing the prima facie case, including the existence of an appropriate issue, is

on the complainant. *Healey v. FCC, supra*, 460 F.2d at 921; *Joint Council of Allergy and Immunology v. American Broadcasting Co.*, 94 FCC2d 734, 735–736 (1983). He cannot satisfy that burden with vague references to unspecified materials. If Galloway wanted to cure the insufficiency of his pleadings, he should have sought a rehearing before the Commission on an amended complaint, rather than appealing to this court. He did not do so.

Galloway also argues that "it is *always* a controversial matter to malign an innocent third party." Brief for petitioner at 19 (emphasis in original). If that were the case, there would be no need for a requirement that the personal attack come during a discussion of an controversial issue of public importance, and the Personal Attack rule would become a substitute for libel actions, nullifying the valid policy choices of the Commission.

We hold that the Commission correctly found that Galloway failed to establish that any personal attack came during the discussion of a "controversial issue of public importance" within the well-established meaning of the Personal Attack rule, and that his personal attack claim was properly rejected.

### III. THE DELIBERATE DISTORTION COMPLAINT

#### A. *The FCC Policy*

The FCC's policy on rigging, staging, or distorting the news was developed in a series of cases beginning in 1969.[2] In the first of these, *Hunger In America*, CBS had shown an infant it said was suffering from malnutrition, but who was actually suffering from another ailment. The Commission found that

> [r]igging or slanting the news is a most heinous act against the public interest—indeed, there is no act more harmful to

---

**2.** *See Hunger In America*, 20 FCC2d 143 (1969); *WBBM–TV*, 18 FCC2d 124 (1969) (allegations that college pot party was staged for camera crew); *Democratic National Convention Television Coverage*, 16 FCC2d 650 (1969) (concerning aspects of coverage of demonstrations out-

side the 1968 convention in Chicago); *Hon. Harley O. Staggers*, 25 Rad.Reg.2d (P & F) 413 (1972) (policy statement in response to a congressional subcommittee investigating the staging of news events).

the public's ability to handle its affairs. In all cases where we may appropriately do so, we shall act to protect the public interest in this important respect. But in this democracy, no government agency can authenticate the news, or should try to do so.

*Hunger In America*, 20 FCC2d 143, 151 (1969). As in all the subsequent cases, the FCC made a crucial distinction between deliberate distortion and mere inaccuracy or difference of opinion.

The Commission realized that news events can be "staged" by the participants as well as by reporters. The behavior of the subjects of news reports is often affected by the presence of television cameras, and in a real sense every news conference is a staged event. In the years since 1969 "media events" from protest demonstrations to "photo opportunities" have become more sophisticated and more pervasive. The technological imperatives of TV news may also require a certain amount of stage managing, for example, shooting "reverses." [3] These were not the kinds of practices that concerned the Commission. "The Commission viewed its proper area of concern to be with those activities which are not a matter of journalistic judgment or a gray area, but rather constitute the deliberate portrayal of a 'significant "event" which did not in fact occur but rather is "acted out" at the behest of news personnel.'" *Hon. Harley O. Staggers*, 25 Rad. Reg.2d (P & F) 413, 414 (1972).

The key elements of this standard are, first, that the distortion or staging be deliberately intended to slant or mislead. It is not enough to dispute the accuracy of a news report, *see Hunger in America, supra*, 20 FCC2d at 150–151, or to question the legitimate editorial decisions of the broadcaster, *see Hon. Harley O. Staggers, supra*, 25 Rad.Reg.2d at 414; *Democratic National Convention Television Coverage*, 16 FCC2d 650, 656 (1969). The allega-

tion of deliberate distortion must be supported by "extrinsic evidence," that is, evidence other than the broadcast itself, such as written or oral instructions from station management, outtakes, or evidence of bribery. *Hunger In America, supra,* 20 FCC2d at 151; *cf.* Staff Ruling at 6 para. 10, JA 320.

Second, the distortion must involve a significant event and not merely a minor or incidental aspect of the news report. The Commission has refused to investigate "inaccurate embellishments concerning peripheral aspects" of news reports or "attempts at window dressing which concerned the *manner* of presenting the news" as long as "the essential facts of the news stories to which these presentational devices related were broadcast in an accurate manner." *WPIX, Inc.,* 68 FCC2d 381, 385–386 (1978) (emphasis in original). "[T]he real criterion with respect to staging is whether the public is deceived about a matter of significance." *Hon. Harley O. Staggers, supra,* 25 Rad.Reg.2d at 420. In one of its early descriptions of news staging and distortion, the Commission said:

> For example, the licensee's newsmen should not, upon arriving late at a riot, ask one of the rioters to throw another brick through a store window for its cameras. First, if the window is already broken, it is staging a news event—one which did not in fact occur, but is acted out at the request of the news personnel; the licensee could fairly present such a film only with the full disclosure of its nature.

*WBBM–TV,* 18 FCC2d 124, 132–133 (1969). More recently, however, the Commission tolerates such practices unless they "affect[ ] the basic accuracy of the events reported." *WPIX, Inc., supra,* 68 FCC2d at 386; *see also Oscar B. White,* 87 FCC2d 954, 959–960 (1981). As with the Personal Attack rule, the Commission's practice in

---

**3.** "Because documentary interviews are normally filmed by a single camera, the film crew typically will train the camera on the individual being interviewed during a question and answer series, and then run through a second 'take', known as a 'reverse', with the camera focused on the interviewer in order to get film footage of his questioning." Brief for respondents at 14 n. 14.

this respect has given its policy against news distortion an extremely limited scope. But within the constraints of the Constitution, Congress and the Commission may set the scope of broadcast regulation; it is not the role of this court to question the wisdom of their policy choices.

B. *The Specific Allegations of Distortion*

■ 1. *The Johnson interview.* The *60 Minutes* broadcast included tape CBS purportedly made when "we observed [insurance investigator Milton Crawford] interrogating insurance claimant Montenette Johnson." At first Johnson is seen telling Crawford that she was involved in an accident. Then Rather says, "Crawford suspects Johnson is lying. * * * After some hard questioning, Johnson changed her story." Johnson then admits that she had filed a fraudulent claim, "[b]ecause somebody told me that if I did it that I would get paid a certain amount of money." *Broadcast Transcript* at 2, JA 32.

Crawford actually "interrogated" Johnson at least twice in succession for CBS cameras, and both times she at first professed the legitimacy of her claim and later (without being confronted with contradictory evidence or the like, but simply being asked again, "Now was it true that you were involved in an accident?" and "Were you really involved in an accident on that date?") she confessed her participation in the fraud. *Compare* JA 55–60 *with* JA 79. Interviews of another woman, not broadcast, followed a similar pattern. *See* JA 41–44, 48–51, 51–55. Galloway alleges that this "clearly shows that what CBS maintained were spontaneous interrogations were, in reality, staged interviews performed for the benefit of and at the behest of CBS news personnel. * * * They were simply giving CBS another 'take' for the 'docudrama' CBS had previously scripted." *Complaint*, JA 12–13.

The Commission disposed of this allegation in a footnote, in which it described this matter as an exercise of "editorial judgment," lacking sufficient evidence of deliberate distortion. Staff Ruling at 7 n. 8, JA 321. We think this is mistaken. The Com-

mission is unlikely to find better circumstantial evidence that an interview is staged, and intervenor CBS never explicitly denied that these "interrogations" were staged. The interrogation was clearly an " 'event' which did not in fact occur but is 'acted out' at the behest of news personnel." *Hon. Harley O. Staggers, supra,* 25 Rad.Reg.2d at 418. And "all staging as [so] defined * * * involves distortion." *Id.* at 419.

On appeal the FCC no longer argues that the evidence of distortion is insufficient. Instead, it asserts that the distortion is not significant. "Galloway did not allege that any of the statements made by the interviewee in the broadcast were false or that the broadcast misrepresented her participation in an insurance fraud scheme. * * Whether or not this individual 'confessed' to involvement in a fraudulent scheme because of 'hard questioning' or for other reasons is not, however, a significant matter." Brief for respondents at 17. Since Ms. Johnson actually *did* participate in the fraud and *did* confess, even if not in precisely the manner portrayed, the "basic accuracy of the events reported," *WPIX, Inc., supra,* 68 FCC2d at 386, has not been distorted. Whatever we may think of this playacting as a journalistic practice, it does not violate FCC rules as currently applied.

2. *The Petty interview.* One of those interviewed for the broadcast was Robert Petty, an attorney who once participated in insurance fraud and now faced disbarment. Rather asked Petty, "If I were an attorney and I sought to specialize in these kind of cases, could I make a quarter of a million dollars a year, half-million dollars a year?" *Broadcast Transcript* at 4, JA 34. During the filming, Petty's answer began, "So long as you were successful," and after discussing the dangers inherent in maintaining a fraudulent scheme concluded, "It's simply not worth it." JA 186. Rather asked the question again for a reverse shot, and this time Petty's (off-camera) answer was "Quite easily." JA 217. In the actual broadcast, CBS used a shot of Petty

responding to a completely different question, saying simply, "Yes."

Galloway alleged that CBS had substituted an affirmative answer for a negative one. We think Petty's answer to the particular question asked ("could I make a quarter of a million dollars * * *?") was clearly affirmative, notwithstanding his warnings about the risks involved. The decision not to include Petty's cautionary remarks is more "a matter of editorial discretion * * * than an act of deliberate distortion." Staff Ruling at 7, JA 321. While the substitution of an answer to another question may fairly be considered distortion *per se,* when it does not affect the "basic accuracy" of the answer it is not "significant" enough to violate FCC rules.

3. *The Crawford interview.* The outtakes show that Dan Rather twice asked insurance investigator Crawford to estimate how much money was involved in a typical fraudulent claim. In the first take (the one *not* broadcast) Crawford replied, "[A]bout eight thousand dollars." JA 140. In the second take, the one ultimately included in the broadcast, Crawford increased his estimate to "[a]pproximately twelve thousand dollars." JA 142. Galloway alleges that between the interviews there is "a gap in the audio tape (not reflected in the unedited transcript), complete with a 'Nixonian' beep," *Complaint,* JA 18, "and that during the gap Rather and his CBS crew, not satisfied with Crawford's numbers, had him revise his figures upward." *Id.,* JA 19.

The transcript unquestionably shows that Crawford revised his estimate, but despite Galloway's contention that "there is no other explanation," it does not show that he did so at the urging of CBS. In the first interview Rather asked Crawford to describe the distribution of the total among the doctor, lawyer, "victim," etc., involved in the scheme. It is possible that in doing so Crawford simply realized that he had underestimated. Perhaps Rather should have asked Crawford why he changed his story, but the failure to do so does not amount to extrinsic evidence that "CBS coached Milton Crawford in order to have him provide a higher estimate." *Id.,* JA 15.

4. *Anonymous doctor interview.* During the broadcast Rather interviewed an unidentified doctor who said he had once been involved in fraudulent insurance claims. In the narration Rather said, "This doctor * * * confided that he used to conspire with 15 different lawyers. He has never been in jail, has never been suspended from practice; indeed, his medical business is booming, and he is respected throughout his profession." *Broadcast Transcript* at 3, JA 33. Galloway's complaint alleges that "Rather knew that virtually every assertion contained in this statement was either completely untrue or deliberately misleading." *Complaint,* JA 22.

The statement *was* somewhat misleading in that it implied the doctor had never been caught. In fact, as the outtakes show, the doctor had struck a plea bargain for turning state's evidence. (It was only when confronted with this fact that he "confided" in Dan Rather.) It is technically accurate, however, that the doctor was never in jail or suspended from practice. Galloway also disputes the statement that the doctor's "medical business is booming, and he is respected throughout the profession." Galloway cites the doctor's statement that "I think the best year I had was my last year, which was 1974," JA 232, as evidence that "the doctor had *not been practicing for five years* before the show was broadcast." *Complaint,* JA 22 (emphasis in original). CBS maintains that it believed, and continues to believe, that 1974 was not the doctor's "last year" in practice, but his last year in insurance fraud. Absent any extrinsic evidence to the contrary, we accept CBS's entirely plausible explanation.

**C.** *Repeal by Non-Enforcement*

Galloway argues that even if the decision in his case is consistent with the Commission's stated policies, the Commission's threshold requirements for complaints "are so excessive that, as a practical matter, they are unreachable and have produced a *de facto* nullification of a valid Act

of Congress." Brief for petitioner at 1–2. These arguments about the Commission's hostility to the Fairness Doctrine owe more to ideology than to law.

First, this court has upheld the FCC policy of requiring a substantial prima facie case before proceeding against a broadcaster. *See American Security Council Education Foundation v. FCC*, 607 F.2d 438 (D.C.Cir.1979) *(en banc)*. This policy reflects an appropriate respect for First Amendment values. Second, it is difficult to determine precisely what "Act of Congress" is being "nullifi[ed]." The Commission's policies on staging and distortion are *not* part of the Fairness Doctrine,[4] but simply an attempt to particularize the statutory duty of broadcasters to "operate in the public interest." 47 U.S.C. § 315(a) (1982). Perhaps the broad public interest standard would justify a stricter policy, but neither the language nor the legislative history of the statute demand it. Congress has shown concern with the danger of distortion in television news,[5] but it has never enacted more particular regulation of the practice. This court will not presume to do so.

### IV. CONCLUSION

Whatever one may think of the production techniques employed by *60 Minutes*, especially in the Johnson and Petty interviews, these techniques are not violations of FCC rules. The Commission's decision on the complaint is therefore

*Affirmed.*

**4.** The Personal Attack rule is a component of the Fairness Doctrine, and the Fairness Doctrine arguably finds some additional statutory support in the requirement that licensees "afford reasonable opportunity for the discussion of conflicting views on issues of public importance." 47 U.S.C. § 315(a) (1982). But even if the statute mandates a general Fairness Doctrine, it does not require an administrative counterpart to a defamation action.

**5.** *See, e.g., Inquiry Into Alleged Rigging of Television News Programs*, H.R.Rep. No. 96, 92d Cong., 2d Sess. (1972):

When film and sound recording of an actual event is presented, the public has a right to

expect that the events have been filmed and recorded as they actually took place, unless there is an appropriate disclosure to the contrary. If this is not done, then the public's attention and interest is being gained under false pretenses * * * [and] people are given manufactured evidence upon which to base their conclusions on matters which vitally affect their lives and those of their children. *Id.* at 3 (statement of Rep. Staggers); *see also Network News Documentary Practices—CBS "Project Nassau,"* H.R.Rep. No. 1319, 91st Cong., 2d Sess. (1970); *Pot Party at a University*, H.R. Rep. No. 108, 91st Cong., 1st Sess. (1969).