Alexander J. SERAFYN, et al., Appellants,

v.

FEDERAL COMMUNICATIONS COMMISSION, Appellee,

CBS Inc., et al., Intervenors.

No. 95–1385, 95–1440 and 95–1608.

United States Court of Appeals, District of Columbia Circuit.

Argued Jan. 23, 1998.

Decided Aug. 11, 1998.

Arthur V. Belendiuk argued the cause and filed the briefs for appellants. Shaun A. Maher and Donna T. Pochoday entered appearances.

C. Grey Pash, Jr., Counsel, Federal Communications Commission, argued the cause for appellee, with whom Christopher J. Wright, General Counsel, and Daniel M. Armstrong, Associate General Counsel, were on the brief.

Richard E. Wiley, Lawrence W. Secrest, III, James R. Bayes, and Daniel E. Troy were on the brief for intervenors CBS Inc. and Westinghouse Electric Corporation.

John Lane Jr., Ramsey L. Woodworth, and Robert M. Gurss entered appearances.

Before: GINSBURG, HENDERSON, and RANDOLPH, Circuit Judges.

GINSBURG, Circuit Judge:

Alexander Serafyn petitioned the Federal Communications Commission to deny or to set for hearing the application of CBS for a new station license. Serafyn objected that CBS was not fit to receive a license because it had aired a news program in which it intentionally distorted the situation in Ukraine by claiming that most Ukrainians are anti-Semitic. The Commission summarily denied the petition, holding that Serafyn had not submitted enough evidence to warrant a hearing. Because the Commission neither applied the correct standard nor provided a reasoned explanation in its decision, we vacate its order and remand the matter to the agency for further proceedings.

Serafyn also petitioned to revoke CBS's existing licenses on the ground that CBS made a material misrepresentation to the Commission when it gave an affiliated station false information regarding its handling of viewer letters complaining about the same program. The Commission denied that petition on the ground that Serafyn had not alleged that CBS intentionally misrepresented the matter to the Commission. We uphold the Commission's decision in this matter as reasonable.

## I. Background

Section 309(a) of the Communications Act provides that the Federal Communications Commission may grant a broadcast license only when it determines that doing so would serve the "public interest, convenience, and necessity." 47 U.S.C. § 309(a). Under § 309(d) of the Act any interested person may petition the FCC to deny or to set for hearing any application for a broadcast license or to revoke an existing broadcaster's license. The petition must contain

specific allegations of fact sufficient to show that ... a grant of the application would be prima facie inconsistent with [the public interest, convenience, and necessity]. Such allegations of fact shall ... be supported by affidavit of a person ... with personal knowledge thereof.

*Id.* The FCC must hold a hearing if it finds that the application presents a "substantial and material question of fact" or if it is otherwise unable to conclude that granting the application would serve the public interest. *See* § 309(e).

As the Commission interprets it, § 309 erects a two-step barrier to a hearing: (1) a petition must contain specific allegations of fact that, taken as true, make out a prima facie case that grant of the application would not serve the public interest; and (2) the allegations, taken together with any opposing evidence before the Commission, must still raise a substantial and material question of fact as to whether grant of the application would serve the public interest. *See Astroline Communications Co. v. FCC*, 857 F.2d 1556, 1561 (D.C.Cir.1988) (describing two-step test). At the first step, "[t]he Commission's inquiry ... is much like that performed by a trial judge considering a motion for a directed verdict: if all the supporting facts alleged in the affidavits were true, could a reasonable factfinder conclude that the ultimate fact in dispute had been established." *Gencom, Inc. v. FCC*, 832 F.2d 171, 181 (D.C.Cir.1987). At the second step, a substantial and material question is raised when "the totality of the evidence arouses a sufficient doubt on the [question whether grant of the application would serve the public interest] that further inquiry is called for." *Citizens for Jazz on WRVR, Inc. v. FCC*, 775 F.2d 392, 395 (D.C.Cir.1985).

In determining whether an allegation of news distortion raises a question about the licensee's ability to serve the public interest, the Commission analyzes both the substantiality and the materiality of the allegation. The Commission regards an allegation as material only if the licensee itself is said to have participated in, directed, or at least acquiesced in a pattern of news distortion. The Commission stated its policy about 30 years ago as follows:

[W]e do not intend to defer action on license renewals because of the pendency of complaints of [news distortion]—unless the extrinsic evidence of possible deliberate

distortion or staging of the news which is brought to our attention, involves the licensee, including its principals, top management, or news management.... [I]f the allegations of staging ... simply involve news employees of the station, we will, in appropriate cases ... inquire into the matter, but unless our investigation reveals involvement of the licensee or its management there will be no hazard to the station's licensed status....

.... Rather, the matter should be referred to the licensee for its own investigation and appropriate handling.

.... Rigging or slanting the news is a most heinous act against the public interest .... [b]ut in this democracy, no Government agency can authenticate the news, or should try to do so.

*Hunger in America,* 20 FCC 2d 143, 150, 151 (1969). In a footnote the Commission added:

[W]e stress that the licensee must have a policy of requiring honesty of its news staff and must take reasonable precautions to see that news is fairly handled.

■ An allegation of distortion is "substantial" when it meets two conditions, as we summarized in an earlier case.

[F]irst, ... the distortion ... [must] be deliberately intended to slant or mislead. It is not enough to dispute the accuracy of a news report ... or to question the legitimate editorial decisions of the broadcaster.... The allegation of deliberate distortion must be supported by "extrinsic evidence," that is, evidence other than the broadcast itself, such as written or oral instructions from station management, outtakes, or evidence of bribery.

Second, the distortion must involve a significant event and not merely a minor or incidental aspect of the news report.... [T]he Commission tolerates ... practices [such as staging and distortion] unless they "affect[ ] the basic accuracy of the events reported."

*Galloway v. FCC,* 778 F.2d 16, 20 (D.C.Cir. 1985) (affirming Commission's holding that CBS's "60 Minutes" had not distorted news by staging insurance investigator's interrogation of fraudulent claimant; because she "actually did participate in the fraud and did confess, even if not in precisely the manner portrayed, the 'basic accuracy of the events reported' ... has not been distorted").

■ As we noted in *Galloway,* the Commission's policy makes its investigation of an allegation of news distortion "extremely limited [in] scope. But within the constraints of the Constitution, Congress and the Commission may set the scope of broadcast regulation; it is not the role of this court to question the wisdom of their policy choices." *Id.* at 21.

In 1994 CBS produced and broadcast a controversial segment of "60 Minutes" entitled "The Ugly Face of Freedom," about modern Ukraine. The broadcast angered some viewers who believed that many elements of the program had been designed to give the impression that all Ukrainians harbor a strongly negative attitude toward Jews. For example, interviewer Morley Safer suggested that Ukrainians were "genetically anti-Semitic" and "uneducated peasants, deeply superstitious." Also, soundbites from an interview with the Chief Rabbi of Lviv, Yaakov Bleich, gave viewers the impression that he believes all Ukrainians are anti-Semites who want all Jews to leave Ukraine. In addition, CBS overlaid the sound of marching boots on a film clip of Ukrainian Boy Scouts walking to church and introduced it in such a way as to give viewers the impression that they were seeing "a neo-Nazi, Hitler Youth-like movement." The narrator also stated that the Ukrainian Galicia Division had helped in the roundup and execution of Jews from Lviv in 1941, though this Division was not in fact even formed until 1943 and therefore could not possibly have participated in the deed. Perhaps most egregiously, when Ukrainian speakers used the term "zhyd," which means simply "Jew," they were translated as having said "kike," which is a derogatory term.

After the broadcast interviewees and members of the Ukrainian–American community deluged CBS with letters. In his letter Rabbi Bleich stated "unequivocally" that his "words were quoted out of the context that they were said" and that "the CBS broadcast was unbalanced" and "did not convey the true state of affairs in Ukraine." Cardinal Lubachivsky, the head of the Ukrainian

Greek Catholic Church, who had also been interviewed, both sent a letter to CBS and released a statement to the press. In the latter he stated, "[M]y office was misled as to the actual thrust of the report. Mr. Fager [the producer] presented the piece as one about 'post-communist Ukraine.' ... I can only deduce that the goal of the report was to present all Western Ukrainians as rabid anti-semites." Many other viewers pointed out historical inaccuracies and offensive statements or characterizations in the show.

Notwithstanding the requirement in 47 C.F.R. § 73.1202 that a licensee keep and make available all letters received from viewers, WUSA–TV in Washington, D.C., forwarded the letters it received to CBS's main office in New York. When a representative of the Ukrainian–American Community Network asked to see the letters, WUSA contacted CBS in New York and was told by Raymond Faiola that the letters were in storage and that a response had been sent to each viewer who wrote in; Faiola attached what he said was a copy of that response. After failing to locate any viewer who had received such a reply, the UACN representative questioned this story. A CBS attorney in turn questioned Faiola, who then explained that the response letter had been sent to only about a quarter of the viewers who had written in about the program. When an intensive advertising campaign, however, failed to turn up even one person in the Ukrainian–American community who had received a response, the UACN representative complained to the Commission and sent a copy of the complaint to counsel for CBS. When CBS's counsel asked Faiola for an affidavit confirming his story, Faiola admitted that the letter he had sent WUSA had been merely a draft and that he had forgotten to have any actual response letters sent out.

*Nos. 95–1385, 1440.* Alexander Serafyn, an American of Ukrainian ancestry, petitioned the Commission to deny or to set for hearing the application of CBS to be assigned the licenses of two stations, arguing that the "60 Minutes" broadcast showed that CBS had distorted the news and therefore failed to serve the public interest. In support of his petition, Serafyn submitted the broadcast itself, outtakes of interviews with Rabbi Bleich, viewer letters, a dictionary supporting his claim about the mistranslation of "zhyd," historical information about the Galicia Division, information showing that CBS had rebuffed the offer of a professor of Ukrainian history to help CBS understand the subject, and seven other items of evidence.

Serafyn also submitted evidence that "60 Minutes" had no policy against news distortion and indeed that management considered some distortion acceptable. For example, according to the *Washington Post,* Mike Wallace, a longtime reporter for "60 Minutes," told an interviewer: "You don't like to baldly lie, but I have." Colman McCarthy, *The TV Whisper, Wash. Post,* Jan. 7, 1995, at A21. Don Hewitt, the executive producer of "60 Minutes," is quoted in the same article as saying that some deception is permissible because "[i]t's the small crime vs. the greater good," and elsewhere as saying that "I wouldn't make *Hitler* look bad on the air if I could get a good story." Richard Jerome, *Don Hewitt, People,* Apr. 24, 1995, at 85, 90.

CBS, taking the position that any official investigation into its news broadcasting "offends the protections of a free press," did not submit any evidence. Nonetheless, the Commission denied the petition without a hearing. *See WGPR, Inc.,* 10 FCC Rcd 8140, 8146–48 (1995). Explaining that it would not investigate an allegation of news distortion without "substantial extrinsic evidence" thereof, the Commission determined that only three of Serafyn's items of evidence were extrinsic to the broadcast itself: the viewer letters, the outtakes of interviews with Rabbi Bleich, and CBS's refusal to use the services of the history professor. All the other evidence, according to the Commission, either concerned "disputes as to the truth of the event ... or embellishments concerning peripheral aspects of news reports or attempts at window dressing which concerned the *manner* of presenting the news." *Id.* at 8147 (emphasis in original, citations omitted). The Commission then held that the three items it regarded as extrinsic evidence "in total ... do[ ] not satisfy the standard for demonstrating intent to distort." *Id.* at 8148. Serafyn had therefore failed to show that

CBS had not met its public interest obligations and had "failed to present a substantial and material issue of fact that the grant of the application ... would be inconsistent with the public interest." *Id.* at 8149.

Serafyn and Oleg Nikolyszyn, another viewer who complained to the Commission and whose appeal we consolidated with Serafyn's, argue that the Commission violated its own standard in concluding that no hearing was necessary. Serafyn implicitly objects also to the standard itself insofar as he argues that it "imposed an impossible burden" upon him by requiring that he present extrinsic evidence sufficient to prove his claim without the benefit of discovery, and that the "objective" evidence he offered should be deemed adequate to warrant a hearing upon the public interest question.

*No. 95–1608.* Serafyn and the Ukrainian Congress Committee of America also petitioned the Commission to revoke or set for a revocation hearing all of the broadcast licenses owned by CBS, arguing that CBS had made misrepresentations to the Commission regarding its treatment of the viewer letters. The Commission denied the petition on the grounds that Serafyn had neither alleged that CBS made a false statement to the Commission (as opposed to WUSA) nor proved that CBS intended to make a false statement. With respect to the latter point the Commission relied solely upon Faiola's affidavit; it did not consider Serafyn's allegations that CBS intentionally misrepresented the facts because they were "not supported by an affidavit from a person with personal knowledge thereof" and therefore did not meet the threshold requirement of § 309(d). *See Stockholders of CBS Inc.,* 11 FCC Rcd 3733 (1995).

## II. News Distortion

With regard to the Commission's requirement that he prove by extrinsic evidence that CBS intended to distort the news, Serafyn argues that the Commission "has never articulated a precise definition of 'extrinsic evidence'" and that its prior decisions suggest it is merely seeking "objective evidence from outside the broadcast which demonstrates, without any need for the Commission to second-guess a licensee's journalistic judgment or for the Commission to make credibility

findings, that the licensee has distorted a news program." He then argues that the Commission misapplied the extrinsic evidence standard by mischaracterizing some evidence as non-extrinsic, failing to discuss other evidence he presented, analyzing each piece of extrinsic evidence separately rather than cumulatively, and requiring him to prove his case rather than simply to raise a material question.

The Commission stands by its characterization of the evidence based upon its definition of extrinsic evidence, which it says "'is evidence outside the broadcast itself,' such as evidence of written or oral instructions from station management, outtakes, or evidence of bribery." Further, the Commission explains that its investigation properly "focuse[d] on evidence of intent of the licensee to distort [deliberately], not on the petitioner's claim that the true facts of the incident are different from those presented," because "[e]xtrinsic evidence [must] demonstrate[ ] that a broadcaster knew elements of a news story were false or distorted, but nevertheless, proceeded to air such programming."

▆▆▆▆ We review the Commission's decision under the arbitrary and capricious standard. *See Astroline,* 857 F.2d at 1562. We will uphold the decision if it is "reasonable and supported by the evidence before it," but "will not 'hesitate to intervene where the agency decision appears unreasonable or bears inadequate relation to the facts on which it is purportedly based.'" *Beaumont Branch of the NAACP v. FCC,* 854 F.2d 501, 507 (D.C.Cir.1988) (quoting *California Public Broadcasting Forum v. FCC,* 752 F.2d 670, 675 (D.C.Cir.1985)). Analyzing the Commission's decision under this standard, we conclude that the agency has failed adequately to explain its decision not to set the application of CBS for a hearing. We therefore vacate the decision of the Commission and remand the matter for further administrative proceedings.

### A. Evidentiary standard

At the outset, we note that the Commission never explained under which step of the inquiry it resolved this case. It began by stating that Serafyn "must satisfy the thresh-

old extrinsic evidence standard in order to elevate [his] allegations to the level of 'substantial and material' "; but then said that Serafyn had not "demonstrate[d]" that CBS intended to distort the news; and finally concluded that because his allegations concerned only one show "such an isolated instance . . . cannot[ ] rise to the level of a 'pattern of prejudice,' the burden required of a petitioner who seeks to make a *prima facie* case." *WGPR*, 10 FCC Rcd at 8148. The Commission's muddled discussion suggests that it not only conflated the first and second steps but also applied the wrong standard in judging the sufficiency of the evidence.

■ As we have explained, the appropriate questions for the Commission to ask at the threshold stage are first, whether the petitioner's allegations make out a prima facie case, and second, whether they raise a substantial and material question of fact regarding the licensee's ability to serve the public interest. Instead, the Commission apparently asked whether Serafyn's evidence proved CBS's intent to distort the news, for it concluded by saying:

> [W]e find, in sum, that the outtakes of the rabbi's interview fail to demonstrate CBS's intent to distort. . . .
>
> The two remaining pieces of evidence . . . fall[ ] far short of demonstrating intent to distort. . . . Serafyn's extrinsic evidence in total, therefore, does not satisfy the standard for demonstrating intent to distort.

*Id.* at 8147, 8148. In requiring Serafyn to "demonstrate" that CBS intended to distort the news rather than merely to "raise a substantial and material question of fact" about the licensee's intent, the Commission has misapplied its standard in a way reminiscent of the problem in *Citizens for Jazz*: "The statute in effect says that the Commission must look into the possible existence of a fire only when it is shown a good deal of smoke; the Commission has said that it will look into the possible existence of a fire only when it is shown the existence of a fire." 775 F.2d at 397. For this reason alone we must remand the case to the agency. Although we do not propose to determine just how much evidence the Commission may require or whether Serafyn has produced it, which are matters for the Commission itself to deter-

mine in the first instance, we can safely say that the quantum of evidence needed to raise a substantial question is less than that required to prove a case. *See id.* (" '[P]rima facie sufficiency' means the degree of evidence necessary to make, *not* a fully persuasive case, but rather what a reasonable factfinder *might* view as a persuasive case—the quantum, in other words, that would induce a trial judge to let a case go to the jury even though he himself would (if nothing more were known) find against the plaintiff").

■ We are also concerned about the Commission's method of analyzing the various pieces of evidence that Serafyn presented. In making its decision the Commission must consider together all the evidence it has. *See Gencom*, 832 F.2d at 181; *Citizens for Jazz*, 775 F.2d at 395. The decision under review, however, suggests (though not conclusively) that the Commission analyzed each piece of evidence in isolation only to determine, not surprisingly, that no item by itself crossed the threshold. *See WGPR*, 10 FCC Rcd at 8147–48. Because we must remand this matter in any case, we need not determine whether the Commission in fact erred in this regard. We simply note that upon remand the Commission must consider all the evidence together before deciding whether it is sufficient to make a prima facie case or to raise a substantial and material question of fact.

**B. Licensee's policy on distortion**

In addition to holding that Serafyn presented insufficient evidence to "demonstrate" that CBS had intentionally distorted the "60 Minutes" episode about Ukraine, the Commission's denial of Serafyn's petition also rested upon the alternative ground that he had not alleged a general pattern of distortion extending beyond that one episode. Upon appeal Serafyn argues—and the Commission does not dispute—that he did present evidence regarding CBS's general policy about distortion, namely the comments of Wallace and Hewitt quoted above, and that the Commission failed to discuss or even to mention this evidence. Both Wallace's comment ("you don't like to baldly lie, but I have") and Hewitt's ("it's the small crime vs.

the greater good") are, to say the least, suggestive. Furthermore, both Wallace (as the most senior reporter and commentator for "60 Minutes") and Hewitt (as the producer of the series) are likely members of the "news management" whose decisions can fairly be attributed to the licensee. *Hunger in America*, 20 FCC 2d at 150. The Commission's failure to discuss Serafyn's allegation relating to CBS's policy on veracity is therefore troubling. Indeed, because of the importance the Commission placed upon the supposed lack of such evidence, its presence in the record casts the Commission's alternative ground into doubt. The Commission must consider these allegations upon remand.

### C. Nature of particular evidence

The Commission gave illogical or incomplete reasons for finding non-probative two of the three pieces of evidence it determined were "extrinsic." It also failed to discuss individually certain alleged factual inaccuracies that Serafyn brought to its attention. Before discussing the Commission's opinion in detail, however, we set out a brief excerpt from the transcript of the broadcast.

> MORLEY SAFER, co-host: ... [T]he west [of Ukraine], where we go tonight, is on a binge of ethnic nationalism. "Ukraine for the Ukrainians" can have a frightening ring to those not ethnically correct, especially in a nation that barely acknowledges its part in Hitler's final solution.
>
> ... [J]ust about every day of the week, the sounds of freedom can be heard, men and women giving voice to their particular view of how the new independent Ukraine should be governed. They disagree about plenty, but do have two things in common: their old enemy, Russian communism, and their old, old enemy, the Jews.
>
> Unidentified Man # 1: (Through Translator) We Ukrainians not have to rely on American [sic] and kikes.
>
> SAFER: Yacoov [sic] Bleich left the United States five years ago to take over as the chief rabbi for the Ukraine.
>
> Rabbi YACOOV [sic] BLEICH: There is, obviously, a lot of hatred in these people that are—that are expounding these

things and saying, you know—obviously if someone, you know, screams, "Let's drown the Russians in Jewish blood," there isn't much love lost there.

> ...
>
> SAFER: ... In western Ukraine at least, Hitler's dream had been realized. It was juden-frei, free of Jews. In the 50 years since, Jews have drifted in from other parts of the old Soviet Union, about 7,000 now in [Lviv]. For some Ukrainians, that's 7,000 too many.
>
> Rabbi BLEICH: Yeah. Well, that's not a secret. They're saying that they want the Jews out.
>
> ...
>
> SAFER: The western Ukraine is fertile ground for hatred. Independence only underlined its backwardness: uneducated peasants, deeply superstitious, in possession of this bizarre anomaly: nuclear weapons....Western Ukraine also has a long, dark history of blaming its poverty, its troubles, on others.
>
> [Unidentified] Man # 2: (Through Translator) Kikes have better chances here than even the original population.
>
> SAFER: Than the Ukrainians.
>
> Man # 2: (Through Translator) Yes.
>
> ...
>
> SAFER: The church and government of Ukraine have tried to ease people's fears, suggesting that things are not as serious as they might appear; that Ukrainians, despite the allegations, are not genetically anti-Semitic. But to a Jew living here ... such statements are little comfort....

Transcript, Joint Appendix at 92–96.

### 1. Extrinsic evidence

We discuss first the Commission's analysis of the three pieces of evidence it found were "extrinsic." The Commission has the responsibility to determine the weight of such evidence. The reasons it gives for doing so, however, must be reasonable and not unfounded.

#### (a) Outtakes of the interview with Rabbi Bleich

The outtakes show that all of Rabbi Bleich's quoted comments were made in response to questions about radical nationalists. Serafyn argued to the Commission that CBS had misrepresented Bleich's views when it broadcast his statements without making clear the context in which they were spoken and without including the qualifications and positive statements that accompanied them. The Commission found that the outtakes could indeed "properly serve as circumstantial evidence of intent," but went on to find that they did not demonstrate an intent to distort the news because:

> Rabbi Bleich's latter, allegedly misleading comments immediately followed ... Safer's statement ... that only "some Ukrainians" are anti-Semitic.... Indeed, that the focus of the "60 Minutes" program was upon only a certain sector of the Ukrainian population is evident from at least three other express references by Safer to "Ukrainian ultranationalist parties," "the Social Nationalists," and other apparently isolated groups of Ukrainians. Thus, rather than constitute a distortion, Rabbi Bleich's negative comments about Ukrainians as utilized can rightly be viewed as limited to only a segment of the Ukrainian population.... Nor do we find intent to distort because CBS did not include in its episode positive statements about Ukraine made by Rabbi Bleich.... [T]he determination of what to include and exclude from a given interview constitutes the legitimate "journalistic judgment" of a broadcaster, a matter beyond the Commission's "proper area of concern."

*WGPR,* 10 FCC Rcd at 8147.

Serafyn argues upon appeal that the Commission erred in failing to find the outtakes persuasive evidence of CBS's intent to distort. The Commission was not unreasonable, however, in finding that Safer's phrase "some Ukrainians" and his other references to extremist groups effectively limited the scope of Bleich's comments to "a segment of the Ukrainian population." *Id.*

#### (b) The viewer letters

The Commission held that the letters CBS received from viewers were extrinsic evidence because they were "external to the program." *Id.* at 8148. In the Commission's view, however, the letters were not probative because the letter writers were not

> "insiders," that is, employees or members of management of CBS. Nor are they persons with direct personal knowledge of intent to falsify.... And letters sent by viewers subsequent to the broadcast [are] evidence clearly incapable of going to intent, because intent is a state of mind accompanying an act, not following it.

*Id.*

The Commission's reasoning here is flawed in two respects. First, a person need not have "direct" personal knowledge of intent in order to have relevant information that constitutes circumstantial evidence about such intent. *See Crawford–El v. Britton,* 93 F.3d 813, 818 (1996) ("[T]he distinction between direct and circumstantial evidence has no direct correlation with the strength of the plaintiff's case"); *CPBF v. FCC,* 752 F.2d at 679 ("Intent [may] be inferred from the subsidiary fact of [a broadcaster's] statements to third parties"). Second, evidence that sheds light upon one's intent is relevant whether it was prepared before or after the incident under investigation; consider, for example, a letter written after but recounting words or actions before an event.

Upon remand, therefore, the Commission may wish to consider separately two types of letters. First, there may be letters that convey direct information about the producers' state of mind while the show was in production. For example, Cardinal Lubachivsky charged that the producers misled him as to the nature of the show. Second, there are letters that point out factual inaccuracies in the show. For example, Rabbi Lincoln, a viewer, wrote in about the mistranslation of "zhyd." Although letters of this type may not have independent significance, they may yet be probative in determining whether an error was obvious or egregious, and if so whether it bespeaks an intent to distort the facts. *See* Part II.C.2 below.

*(c) The refusal to consult Professor Luciuk*

Serafyn asserted that CBS's refusal to consult Professor Luciuk demonstrated its intent to distort the news because only someone with no intention to broadcast the truth would refuse to use the services of an expert. The Commission found that evidence of the broadcaster's decision was extrinsic to the program but that it "falls far short of demonstrating intent to distort the ... program" because the "[d]etermination[ ] as to which experts to utilize is a decision solely within the province of the broadcaster." *WGPR*, 10 FCC Rcd at 8148. Once again, the agency's reasoning is too loose. Serafyn raises no question about the broadcaster's discretion to decide whom, if anyone, to employ; it is only because the broadcaster has such discretion that its ultimate decision may be probative on the issue of intent. Before the Commission may reject this evidence, therefore, it must explain why CBS's decision to employ one expert over another—or not to employ one at all—is not probative on the issue of its intent to distort.

2. Evidence of factual inaccuracies

In describing what evidence it would accept to substantiate Serafyn's claim of news distortion, the Commission stated that it has "long ruled that it will not attempt to judge the accuracy of broadcast news reports or to determine whether a reporter should have included additional facts." *WGPR*, 10 FCC. Rcd at 8147. In "balancing First Amendment and public interest concerns," it explained, the Commission

> will not attempt to draw inferences of distortion from the content of a broadcast, but it will investigate where allegations of news distortion are supported by "substantial extrinsic evidence" that the licensee has deliberately distorted its news report. *Mrs. J.R. Paul*, 26 FCC 2d at 592. "Extrinsic evidence," that is, evidence outside the broadcast itself, includes written or oral instructions from station management, outtakes, or evidence of bribery. *Hunger in America*, 20 FCC 2d at 151. Our assessment of allegations of news distortion, in sum, focuses on evidence of intent of the licensee to distort, not on the petitioner's

claim that the true facts of the incident are different from those presented.

*WGPR*, 10 FCC Rcd at 8147.

Serafyn argues that the definition quoted above does not purport to be all-inclusive, and that the Commission acted unreasonably in holding that the evidence he submitted is not also extrinsic. In his view the agency should inquire "whether the licensee has distorted a news program" and the Commission can make this inquiry—without becoming a national arbiter of truth—by relying upon "objective" evidence to disprove assertions made in a news show. Intervenor CBS argues that the "objective" nature of evidence has never been considered in determining whether it is extrinsic. The Commission responds that however one defines "extrinsic evidence," it does not include that which goes only to the truth of a matter stated in the broadcast.

The Commission has not so much defined extrinsic evidence as provided examples of the genre and what lies outside it. While the Commission certainly may focus upon evidence relevant to intent and exclude all else, the problem is—as the Commission's past decisions show—that the inaccuracy of a broadcast can sometimes be indicative of the broadcaster's intent. *See Application of WMJX*, 85 FCC 2d 251 (1981) (station denied intent to mislead public but admitted it knew news broadcast was false; Commission implicitly concluded from broadcaster's knowledge of falsity that it had intended to mislead public); *see also Hunger in America*, 20 FCC 2d at 147 (Commission may intervene "in the unusual case where the [truth of the] matter can be readily and definitely resolved").

 Here, Serafyn argues that CBS got its facts so wrong that its decision to broadcast them gives rise to the inference that CBS intentionally distorted the news. Without deciding whether Serafyn's arguments about individual facts are correct, or even specifying what standard the Commission should use when analyzing claims of factual inaccuracy, we must point out that an egregious or obvious error may indeed suggest that the station intended to mislead. This is not to say that the Commission must investi-

gate every allegation of factual inaccuracy; if the broadcaster had to do historical research or to weigh the credibility of interviewees, for example, then any alleged inaccuracy is almost certainly neither egregious nor obvious. Our point is only that as an analytical matter a factual inaccuracy can, in some circumstances, raise an inference of such intent. The Commission therefore erred insofar as it categorically eliminated factual inaccuracies from consideration as part of its determination of intent.*

The chief example we have in mind is the apparent mistranslation of "zhyd" as "kike." Such a highly-charged word is surely not used lightly. Of course, translation is a tricky business, and it is axiomatic that one can never translate perfectly. Nonetheless, a mistranslation that "affect[s] the basic accuracy" of the speaker is problematic under the Commission's standard. *Galloway,* 778 F.2d at 20.

Translating can be compared to editing a long interview down to a few questions and answers. In *The Selling of the Pentagon,* the Commission addressed an interviewee's allegation that CBS's "60 Minutes" had "so edited and rearranged [his answers to questions posed] as to misrepresent their content." 30 FCC 2d 150, 150 (1971). Although it decided in that case that the interviewee had not been so badly misrepresented as to require action by the Commission, the agency allowed that it "can conceive of situations where the documentary evidence of deliberate distortion would be sufficiently strong to require an inquiry—e.g., where a 'yes' answer to one question was used to replace a 'no' answer to an entirely different question." *Id.* Changing "Jew" to "kike" may be as blatant a distortion as changing a "no" answer to a "yes," so greatly does it alter the sense of the speaker's statement; if so, then the basic accuracy of the report is affected. Further, when the word chosen by the translator is an inflammatory term such as "kike," the licensee could be expected to assure itself of the accuracy of the translation; if it does not do so, the Commission may appropriately consider that fact in reaching a conclusion

about the broadcaster's intent to distort the news. The Commission was therefore unreasonable in dismissing this charge without an explanation.

We need not discuss here each of the other factual inaccuracies raised by Serafyn. On remand the Commission should consider whether any other error was sufficiently obvious and egregious to contribute to an inference about CBS's intent, and therefore to qualify as "extrinsic evidence."

### D. Misrepresentation

In *Stockholders of CBS, Inc.* Serafyn argued that CBS made a misrepresentation to the Commission by misleading WUSA about its treatment of the viewer letters and thereby causing the affiliate to transmit that erroneous information to the Commission. The Commission responded that "[m]isrepresentation is composed of two elements: a material false statement made to the Commission and an intent to make such a statement." 11 FCC Rcd at 3753. The Commission then held Serafyn had neither alleged that CBS had made its representation directly to the Commission nor "provided [any] evidence that CBS [had] intended to convey false information to the Commission through its affiliate." *Id.*

▄▄▄▄ In reviewing the Commission's conclusion that CBS did not make a misrepresentation we ask only whether the Commission was "cognizant of the issue raised and, upon the record, reasonably resolve[d] that issue." *WEBR, Inc. v. FCC,* 420 F.2d 158, 164 (D.C.Cir.1969). In this case the answer to both questions is yes.

There is no dispute that CBS did not make its false statement directly to the Commission. Serafyn argues, however, that directness has never been required, that "CBS was aware of Appellants' complaint against WUSA–TV," and that CBS's misrepresentations to WUSA therefore should "be taken as seriously as if made directly to the Commission." The Commission responds first that there is no evidence that CBS intended to make any misrepresentation—"the most that

---

* Counsel for the Commission was unable to say at oral argument whether the agency simply did not believe that such evidence could ever be probative—which would be a mistake—or understood the point we are making but chose to exclude such evidence for prudential reasons—which would be an exercise of judgment within its discretion if not unreasonable.

was shown in the record below was that one official of CBS was careless or negligent in providing information to [WUSA]"—and second that it will sanction only a misrepresentation made directly to the Commission or intended to be passed on to the Commission.

The Commission reasonably found Serafyn had not alleged that CBS intended to make any representation either directly or indirectly "to the Commission." Assuming for the sake of the argument that CBS could be sanctioned for making a misrepresentation through WUSA, we agree with the Commission that Serafyn did not substantiate his claim that CBS knew about the complaint pending before the agency when it made the two misrepresentations to WUSA. Serafyn's only evidence is that the UACN had sent CBS's counsel a copy of the complaint, but that was after WUSA had received the misinformation and relayed it to the Commission.

Absent any allegation that CBS knew that the first two versions of the incident it provided to WUSA would make their way to the Commission, the agency reasonably decided not to sanction CBS for misrepresentation.

### III. Conclusion

The Commission acted arbitrarily and capriciously in denying Serafyn's petition without analyzing more precisely the evidence he presented. On the other hand, the Commission reasonably held that CBS did not make a misrepresentation to the Commission. We therefore vacate and remand the Commission's decision in *WGPR* and affirm its decision in *Stockholders of CBS Inc.*

*So ordered.*