**AMERICAN LEGAL FOUNDATION, Petitioner,**

v.

**FEDERAL COMMUNICATIONS COMMISSION and the United States of America, Respondents,**

**American Broadcasting Companies, Inc., Intervenors.**

**No. 85–1696.**

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 27, 1986.

Decided Jan. 9, 1987.

---

Michael P. McDonald, Muskegon, Mich., for petitioner.

C. Grey Pash, Jr., Counsel, F.C.C., with whom Jack D. Smith, Gen. Counsel, Daniel M. Armstrong, Gerald M. Goldstein, Counsel, F.C.C., John J. Powers, III and Marion L. Jetton, Atty., Dept. of Justice, Washington, D.C., were on the brief for respondents.

Andrea Limmer, Washington, D.C., entered an appearance for respondents.

J. Roger Wollenberg, with whom Joel Rosenbloom and Murray A. Indick, Washington, D.C., were on the brief for intervenor.

Douglas S. Land, James A. McKenna, Jr., and Robert W. Coll, Washington, D.C., entered appearances for intervenor.

Before STARR and BUCKLEY, Circuit Judges, and PARSONS,* Senior District Judge.

Opinion for the Court filed by Circuit Judge STARR.

STARR, Circuit Judge:

We have before us a petition for review by the American Legal Foundation ("ALF"). ALF challenges a decision by the Federal Communications Commission not to initiate an investigation of the Foundation's administrative complaint, which charged the American Broadcasting Companies, Inc. with news distortion, news suppression, and violation of the fairness doctrine in a series of nationally televised news broadcasts pertaining to the Central Intelligence Agency. The FCC has moved to dismiss the petition on the ground that the Foundation lacks standing to seek review of the Commission's decision. We agree that ALF lacks standing and therefore dismiss the petition.

## I

Four broadcasts during September and November 1984 on ABC's "World News Tonight" sparked the controversy that led to this litigation. Those broadcasts reported allegations of CIA involvement with a Honolulu investment firm that went bankrupt and which was accused of defrauding investors of $22 million. Specifically, on ABC's "World News Tonight" on September 19, 1984, the network broadcast an interview with one Ronald Rewald, former president of the ill-starred firm. In that interview, Rewald claimed that he was a CIA agent and that his investment firm

---

* Of the United States District Court for the Northern District of Illinois, sitting by designation pursuant to 28 U.S.C. § 294(d).

had served as a cover for foreign and domestic CIA operations, some of them illegal.

The second ABC report aired on September 20, 1984. It reported Rewald's explosive charge that, following allegations that his Honolulu firm had swindled numerous investors, the CIA decided to assassinate him. A former Honolulu prison guard, Scott Barnes, purported to corroborate Rewald's accusation by claiming to have been hired by the CIA to kill Rewald. Yet another interviewee, Ted Frigard, similarly claimed that a CIA representative threatened his life in order to discourage him from pursuing a lawsuit against the investment firm and the Agency.

In a third broadcast on September 26, 1984, ABC reported that the CIA had publicly denied what the network had reported in the previous two broadcasts. At the same time, ABC announced that it was standing by its earlier reports. Finally, on November 21, 1984, ABC aired what it called an "update and clarification," in which the network admitted that it had been unable to corroborate Scott Barnes' story. ABC further conceded that the network had no reason to doubt the CIA's denial of Barnes' provocative allegations.[1]

Dissatisfied with ABC's apparent partial retraction, the CIA filed a complaint against ABC with the FCC.[2] The CIA claimed that ABC had deliberately reported false information about the CIA's ties with Rewald's investment firm. The CIA advanced four assertions to buttress its claim: (1) ABC never attempted to verify the claims made by Rewald and others whom the network interviewed; (2) ABC improperly refused to accept as true the CIA's vigorous denial of these claims; (3)

ABC ignored information available in public documents tending to show that the CIA was not significantly involved in the Rewald firm; and (4) ABC unquestioningly broadcast statements by Scott Barnes when it knew that he was a completely untrustworthy source.[3]

The CIA argued that these defects demonstrated that ABC had deliberately distorted and suppressed news in violation of well-settled Commission policy. *See, e.g., Black Producer's Association,* 70 F.C.C.2d 1920, 1921 (1979) (distortion); *Wayne Lemons,* 67 F.C.C.2d 160, 165 (1977) (suppression); *Hunger in America,* 20 F.C.C.2d 143 (1969) (staging and distortion); *Network Coverage of the Democratic National Convention,* 16 F.C.C.2d 650 (1969) (same). Moreover, in the CIA's view, ABC's suppression of evidence tending to disprove CIA involvement in illegal activities violated the Commission's much-debated fairness doctrine, which in pertinent part requires a licensee presenting one side of a controversial issue of public importance to afford a reasonable opportunity for the presentation of contrasting views. *See, e.g., Red Lion Broadcasting Co. v. FCC,* 395 U.S. 367, 375–79, 89 S.Ct. 1794, 1798–1800, 23 L.Ed.2d 371 (1969); *American Security Council Education Foundation v. FCC,* 607 F.2d 438, 443 & n. 12 (D.C.Cir.1979), *cert. denied,* 444 U.S. 1013, 100 S.Ct. 662, 62 L.Ed.2d 642 (1980). Finally, since ABC's series of reports impugned the character and integrity of the CIA, the broadcasts were denounced as contravening the personal attack rule, a component of the fairness doctrine under which a licensee engaging in such attacks must notify the entity (or person) attacked and permit it to respond. 47 C.F.R. § 73.1920 (1984); *see*

---

1. *See* CIA Complaint, *CIA v. FCC,* FCC No. 85–374, App. (Nov. 21, 1984) (transcript of ABC broadcasts), Joint Appendix ("J.A.") at 2, 25–29.

2. *Id.,* J.A. at 1.

3. To support its claim that ABC knew that Scott Barnes was untrustworthy, the Foundation noted in its complaint that Mr. Barnes had approached ABC reporter Ted Koppel in 1982, claiming involvement with CIA plots to assassinate Americans in Laos. *See* ALF Complaint,

*CIA v. FCC,* FCC No. 85–374, at 15 (Jan. 10, 1985) [hereinafter "ALF Complaint"], J.A. at 39, 55. Mr. Koppel refused to credit Mr. Barnes' story. ALF also included in its complaint a copy of a *Los Angeles Times* article that reported disagreement among journalists who cover intelligence matters whether Mr. Barnes' allegations of various illegal conduct by the CIA could be believed. *See id.* App. F (reproducing Crook, *ABC Retraction of CIA Murder Plot Detailed,* L.A. Times, Dec. 13, 1984, § 6, at 1), J.A. at 128, 129–30.

also *Red Lion*, 395 U.S. at 378, 89 S.Ct. at 1800; *Galloway v. FCC*, 778 F.2d 16, 18 (D.C.Cir.1985). The CIA requested an investigative hearing on ABC's production of the broadcasts. It also asked the Commission to consider the alleged abuses in ruling on applications by ABC stations for license renewal. *See* 47 U.S.C. §§ 308, 309 (1982 & Supp. III 1985); *see also Hunger in America*, 20 F.C.C.2d at 151 n. 6.

The CIA's complaint prompted filings by a number of media groups, including the American Legal Foundation. These filings raised, among other things, the issue whether government agencies such as the CIA had standing to file administrative complaints with the Commission. The Commission staff denied the CIA's complaint.[4] It found that the CIA enjoyed standing but had failed to "establish prima facie complaints sufficient to initiate a Commission inquiry or sanctions."[5]

On the day the staff denied the CIA's complaint, ALF filed its complaint against ABC. Although the Foundation's complaint more fully described the contrary evidence allegedly suppressed by ABC, the pleading in most respects mirrored that of the CIA.[6] ALF, too, sought a ful-scale Commission investigation, complete with public hearing, and a variety of sanctions against ABC, including revocation of licenses of all ABC stations. ALF's complaint was consolidated with the CIA's for consideration by the full Commission, from whom the CIA sought reconsideration of the staff ruling. *See* 47 C.F.R. § 1.725(a) (1986).

The Commission denied both complaints and concluded that no further action was warranted.[7] In response to pleadings filed by other parties, the FCC decided prelimi-

narily that government agencies enjoy standing to bring news distortion and fairness doctrine complaints.[8] That threshold issue settled, the Commission then rejected charges of news distortion and suppression because neither complaint provided "direct extrinsic evidence that [ABC] possessed a deliberate intent to distort the news." That element, according to the Commission, constituted the initial showing required to trigger an agency inquiry.[9] Similarly, the Commission concluded that neither party's complaint established a *prima facie* violation of the fairness doctrine. Specifically, the complaints did not properly identify issues on which views were broadcast or demonstrate that the issues were "controversial," that is, were "subject[s] of vigorous debate with substantial elements of the community in opposition to one another."[10] Finally, the Commission concluded that the "personal attack" alleged in the complaint took place during "bona fide newscasts," a genre of programming that the Commission exempts from the personal attack rule.[11]

## II

The Foundation maintains that the Commission acted arbitrarily and capriciously in rejecting its charges against ABC. An antecedent issue confronts us, however, for the Commission seeks to have us dismiss the petition on the ground that ALF lacks standing to seek review in this court. Constrained to agree with the Commission on this threshold issue, we stop short of the merits of ALF's challenge.

By its own description, ALF is a "non-profit media law center which works to promote media fairness and accountability."[12] According to the Foundation, its

4. *CIA v. ABC*, FCC No. 85–374 (Staff Ruling dated Jan. 10, 1985), J.A. at 30.

5. *Id.* at 1 n. 1, 4, J.A. at 30 n. 1, 33.

6. *See* ALF Complaint, *supra* note 3, J.A. at 39.

7. *CIA v. FCC*, FCC No. 85–374 (Commission Order dated Sept. 11, 1985), J.A. at 271.

8. *Id.* at 5–7, J.A. at 275–77. The Commission did not decide whether government agencies have standing to file a complaint charging a violation of the personal attack rule because it

concluded as a threshold matter that the alleged attack on the CIA occurred during "bona fide newscasts," which are exempt from that rule.

9. *Id.* at 7 (citing *Hunger in America*, 20 F.C.C.2d at 150), J.A. at 277.

10. *Id.* at 8–10, J.A. at 278–80.

11. *Id.* at 12, J.A. at 282; *see supra* note 8.

12. ALF's Opposition to Motion to Dismiss 5 (May 7, 1986).

specific "institutional interest" is "seeing to it that the Commission's fairness doctrine and news distortion policies are enforced." [13] To this end, ALF regularly initiates complaints before the Commission, intervenes in FCC proceedings, and monitors broadcasters for compliance with the law.[14]

ALF has no members. In fact, the Foundation's corporate charter expressly prohibits it from having any.[15] Instead of claiming to speak for a discrete membership body, ALF purports to represent the interests of all members of the public who regularly watch ABC News (and other network news broadcasts). ALF submitted three affidavits to the Commission to buttress its claim that the Foundation represents the views of at least some ABC viewers. Each document recites that the affiant "support[s] [ALF] in its efforts to have the Commission order ABC to comply with its fairness doctrine obligations," and that ALF "represents [the affiant's] interests as a regular viewer of ABC's programming." [16]

On the basis of these allegations, the Foundation claims standing to challenge the FCC's decision both on its own behalf and on behalf of its "supporters." [17]

### III

It is a fundamental precept of our constitutional system that the judiciary is limited to deciding "cases" and "controversies." *See Valley Forge Christian College v. Americans United for Separation of Church & State, Inc.,* 454 U.S. 464, 471, 102 S.Ct. 752, 757, 70 L.Ed.2d 700 (1982). "Standing" denominates one feature of the Article III case-or-controversy limitation.

It focuses on the complaining party to determine "whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues." *Warth v. Seldin,* 422 U.S. 490, 498, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975). The Supreme Court has in recent years distilled the constitutional requirement of standing into a three-part inquiry: "A plaintiff must allege [1] personal injury [2] fairly traceable to the defendant's allegedly unlawful conduct and [3] likely to be redressed by the requested relief." *Allen v. Wright,* 468 U.S. 737, 751, 104 S.Ct. 3315, 3325, 82 L.Ed.2d 556 (1984); *see also Valley Forge,* 454 U.S. at 472, 102 S.Ct. at 758.

The Supreme Court has described standing as a means of protecting the integrity of the federal judiciary, our tripartite system of coequal branches, and the interests of individuals. The doctrine protects courts by "assur[ing] that the legal questions presented to the court will be resolved, not in the rarified atmosphere of a debating society, but in a concrete factual context conducive to a realistic appreciation of the consequences of judicial action." *Valley Forge,* 454 U.S. at 472, 102 S.Ct. at 758; *see also Baker v. Carr,* 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962). By limiting access to those who can demonstrate "injury in fact," the standing doctrine "reflects a due regard for the autonomy of those persons likely to be most directly affected by a judicial order." *Valley Forge,* 454 U.S. at 473, 102 S.Ct. at 759; *see also Sierra Club v. Morton,* 405 U.S. 727, 740, 92 S.Ct. 1361, 1368, 31 L.Ed.2d 636 (1972). Finally, and most important, standing is "founded in concern about the proper—and properly limited—role of the

---

13. *Id.*

14. *See id.; see also* ALF Complaint, *supra* note 3, at 3–5, J.A. at 43–45; *id.* App. B.

15. Articles of Incorporation of American Legal Foundation, Art. 4, *reproduced in* Appendix to Respondent's Brief; *cf. International Union, UAW v. Brock,* 106 S.Ct. at 2531 (Court looks to union's constitution to assess its claim of associational standing).

16. Supplement to Complaint filed by ALF, App. J. (Feb. 1, 1985), J.A. at 151–57.

17. At oral argument, counsel for FCC expressed skepticism as to ALF's having in fact alleged standing in its own behalf, as well as on behalf of its "supporters." As indicated in the text, we conclude that ALF has done so. *See* ALF's Opposition to Motion to Dismiss, *supra* note 12, at 2 (alleging "institutional commitment to overseeing licensee adherance [sic] to the Commission's news distortion policies and the fairness doctrine"); *id.* at 5 (reiterating "institutional interest," citing *Havens Realty Corp.,* 455 U.S. 363, 102 S.Ct. 1114, 71 L.Ed.2d 214); *id.* at 6 (alleging standing in "dual context").

courts in a democratic society" and in a system of government based on separation of powers. *Allen v. Wright,* 468 U.S. at 750, 752, 104 S.Ct. at 3324–25 (quoting *Warth,* 422 U.S. at 498, 95 S.Ct. at 2204).

■■■ When an organization seeks standing to litigate, it may do so in two capacities. First, and most obviously, it may sue on its own behalf. In this institutional capacity, the organization's pleadings must survive the same standing analysis as that applied to individuals. *Havens Realty Corp. v. Coleman,* 455 U.S. 363, 378–79, 102 S.Ct. 1114, 1124, 71 L.Ed.2d 214 (1982); *see also Village of Arlington Heights v. Metropolitan Housing Development Corp.,* 429 U.S. 252, 260–64, 97 S.Ct. 555, 560–63, 50 L.Ed.2d 450 (1977). Second, even if an organization itself has suffered no "injury in fact," the organization may nonetheless sue in certain circumstances on behalf of its members. *Hunt v. Washington State Apple Advertising Commission,* 432 U.S. 333, 342, 97 S.Ct. 2434, 2441, 53 L.Ed.2d 383 (1977). To secure the latter form, namely "associational standing," an organization must show that

(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.

*Id.* at 343, 97 S.Ct. at 2441; *see also International Union, UAW v. Brock,* — U.S. ——, 106 S.Ct. 2523, 91 L.Ed.2d 228 (1986) (reaffirming associational standing test of *Hunt*). With these principles in mind, we turn to the case before us.

### A

■■■ We pause at the outset to note two issues raised by ALF that do not affect our analysis. First, contrary to ALF's assertions, the FCC did not purport to address the Foundation's standing to seek review in this court, nor can ALF claim standing solely by virtue of its participation in proceedings before the Commission. *California Association of the Physically Handicapped, Inc. v. FCC,* 778 F.2d 823, 826 n. 8 (D.C.Cir.1985); *see also Center for*

*Auto Safety v. NHTSA,* 793 F.2d 1322, 1328–29 n. 41 (D.C.Cir.1986) (organization participation in rulemaking at agency level "does not, in and of itself, satisfy *judicial* standing requirements") (emphasis in original). Second, while Congress has generously provided for judicial review of "any order" of the Commission in 47 U.S.C. § 402(a) (1982) (the statute upon which ALF asserts subject matter jurisdiction), that statute does not specify *who* may seek judicial review of Commission orders. *See also* 28 U.S.C. § 2342(1) (1982). And in any event, Congress cannot statutorily remove or diminish the constitutional limits on which standing is based. *See, e.g., Gladstone, Realtors v. Village of Bellwood,* 441 U.S. 91, 100, 99 S.Ct. 1601, 1608, 60 L.Ed.2d 66 (1979); *Center for Auto Safety,* 793 F.2d at 1335–36; *cf. FCC v. Sanders Brothers Radio Station,* 309 U.S. 470, 476, 60 S.Ct. 693, 698, 84 L.Ed. 869 (1940) (Congress can confer standing on those alleging economic injury).

### B

■■■ In evaluating ALF's ability to bring this suit on behalf of its "supporters," we directly confront the issue whether an organization can premise associational standing on the claims of individuals who are not *members* of the organization. The assumption that an organization litigates on behalf of its members is, after all, implicit in the three-part test articulated in *Hunt,* *quoted supra.* Thus, we cannot assess ALF's standing to challenge the FCC orders under this test before resolving this threshold issue, which appears to be one of first impression for our court.

Fortunately, we do not labor without guidance, for *Hunt* itself concerned an organization that premised standing upon the claims of non-members. The organization in *Hunt,* the Washington State Apple Advertising Commission, was an agency created by the state legislature to promote and protect the State's apple industry. The Commission was composed of 13 apple growers and dealers elected by fellow growers and dealers. *Hunt,* 432 U.S. at 336–37, 97 S.Ct. at 2438. Assessments levied upon those growers and dealers provid-

ed the Apple Commission's sole source of funding. *Id.* at 337, 97 S.Ct. at 2438. The Apple Commission claimed standing on behalf of Washington State's growers and dealers to challenge a North Carolina statute that prevented Washington apples from being labeled as such in North Carolina. *See id.* at 338–39, 97 S.Ct. at 2438–39. Faced with this cross-country dispute, the Supreme Court held that the Washington Commission successfully asserted associational standing because "for all practical purposes [it] perform[ed] the functions of a traditional trade association," which clearly could satisfy associational standing requirements. *Id.* at 344, 97 S.Ct. at 2442.

The *Hunt* Court discerned three reasons for treating the Apple Commission like a traditional membership association. First, it "serve[d] a specialized segment of the State's economic community which is the primary beneficiary of its activities, including the prosecution of this kind of litigation." *Id.* Second, the growers and dealers on whose interests the Commission relied for standing "possess[ed] all of the indicia of membership." *Id.* They elected Commission members; they alone served on the Commission; and they alone financed Commission activities, including litigation. As a result, the Commission "[i]n a very real sense ... provide[d] the means by which [dealers and growers] express[ed] their collective views and protect[ed] their collective interests." *Id.* at 345, 97 S.Ct. at 2442. Finally, the fortunes of the Commission were closely tied to those of its constituency. If the North Carolina statute remained on the books, it was likely to depress annual revenues from the sale of Washington apples, which would in turn lower assessments paid to the Commission. *See id.* Under these circumstances, the Court held, the organization could base standing on the rights of non-members.

ALF's relationship to its "supporters" bears none of the indicia of a traditional membership organization discussed in *Hunt.* With its broadly defined mission as a "media watchdog," ALF serves no discrete, stable group of persons with a definable set of common interests. To the con-

trary, ALF's constituency of supporters is completely open-ended; ALF could, consistent with this "institutional commitment," purport to serve all who read newspapers, watch television, or listen to the radio. Furthermore, it does not appear from the record that ALF's "supporters" play any role in selecting ALF's leadership, guiding ALF's activities, or financing those activities. Finally, we can discern no linkage between ALF's interest in the outcome of this kind of litigation and those of its supporters. Lacking a definable membership body whose resources and wishes help steer the organization's course, ALF "may have reasons for instituting a suit ... other than to assert rights of its [supporters]," and so cannot be described as "but the medium through which individual[s] ... seek to make more effective the expression of their own views." *Telecommunications Research & Action Center v. Allnet Communication Services, Inc.,* 806 F.2d 1093, 1095–96 (D.C.Cir.1986) (quoting *International Union, UAW,* 106 S.Ct. at 2537 (Powell, J., dissenting), and *NAACP v. Alabama,* 357 U.S. 449, 459, 78 S.Ct. 1163, 1170, 2 L.Ed.2d 1488 (1958)). Thus, we cannot conclude, as could the *Hunt* Court, that the organization before us is the functional equivalent of a traditional membership organization.

Perhaps recognizing that *Hunt's* reasoning cannot reasonably be extended to accommodate its assertion of associational standing, ALF argues that case law from this court establishes its capacity to maintain the present petition. Specifically, ALF directs us to a line of cases that weaved the doctrine of "viewer standing." *See Office of Communication of United Church of Christ v. FCC,* 359 F.2d 994, 1002 (D.C.Cir. 1966). As its name suggests, "viewer standing" permits an individual viewer to claim injury in fact and thereby enjoy standing to contest proposed renewals of broadcast licenses. The present concern, however, is not with the standing of the individual "supporters" whom ALF claims to represent. ALF is obviously not a viewer, nor is it here as counsel for a named, identifiable viewer. Instead, we are con-

cerned with the relationship between those individual viewers and ALF. The doctrine of viewer standing simply does not address whether, in the absence of a membership relation, an organization can premise standing on the fact that it has located certain individuals who agree with its complaint.

Moreover, several considerations counsel restraint in straying from the framework of associational standing crafted in *Hunt*, even assuming we were at liberty to do so.[18] First, only last Term the Supreme Court reaffirmed the principles elaborated in *Hunt. International Union, UAW*, 106 S.Ct. at 2532–34. Second, this court recently rejected an invitation to relax the requirements for associational standing articulated in *Hunt* when doing so would undermine the "theoretical identity" between organizations and individuals on which associational standing is based. *See Telecommunications Research & Action Center v. Allnet Communication Services, Inc.*, 806 at 1095 (D.C.Cir.1986) (quoting *International Union, UAW*, 106 S.Ct. at 2537 (Powell, J., dissenting)). We believe that pretermitting the *Hunt*-mandated inquiry into ALF's resemblance to a traditional membership organization would have this precise effect, as well as display infidelity to governing precedent. Third, our colleagues on the Seventh Circuit confronted not long ago the precise issue raised in this case—whether "to extend representational capacity standing to entities other than associations which actually represent interests of parties whose affiliation with the representational litigant is that of membership with the representative or substantial equivalent of membership." The court squarely rejected the proposed extension. *HOPE, Inc. v. County of DuPage*, 738 F.2d 797, 814–15 (7th Cir.1984).

Finally, even assuming our ability to relax *Hunt's* requirements, the facts of this case do not present an appropriate context for such latitudinarianism. As already dis-

cussed, one principle undergirding the standing doctrine is that "the decision to seek review must be placed 'in the hands of those who have a direct stake in the outcome,' ... not ... in the hands of 'concerned bystanders,' who will use it simply as a 'vehicle for the vindication of value interests.'" *Diamond v. Charles*, —— U.S. ——, 106 S.Ct. 1697, 1703, 90 L.Ed.2d 48 (1986) (quoting *Sierra Club*, 405 U.S. at 740, 92 S.Ct. at 1368, and *United States v. SCRAP*, 412 U.S. 669, 687, 93 S.Ct. 2405, 2415, 37 L.Ed.2d 254 (1973)). In this case, it is manifest that the CIA had the most direct, concrete stake in the outcome of the FCC's proceedings. After advancing arguments virtually identical to those now championed by ALF and having failed to persuade the FCC to investigate ABC's compliance with applicable legal requirements, the CIA decided not to seek judicial review. By not seeking review, the party most directly involved in this dispute has indicated, for whatever reason, acquiescence in the FCC's decision. Standing principles counsel respect for that decision. *Cf. Diamond*, 106 S.Ct. at 1704.

### C

ALF's standing claim fares no better when we examine its capacity to sue in its own behalf. Both Supreme Court decisions and, more humbly, those of our court make clear that ALF has not alleged a sufficient "injury in fact" to confer standing.

■ To establish "injury in fact," an organization, like an individual, must allege more than "simply a setback to [its] abstract social interests." *Havens Realty Corp.*, 455 U.S. at 379, 102 S.Ct. at 1124 (citing *Sierra Club*, 405 U.S. at 739, 92 S.Ct. at 1368). Instead, it must allege "concrete and demonstrable injury to the organization's activities." *Id.* Thus, in *Havens*, a housing organization whose counseling and referral services were thwarted by the defendant's racial steering practices alleged a cognizable injury to dis-

---

18. The *Hunt* Court did not expressly characterize its analysis as grounded in Article III. Since *Hunt*, the Court has not made clear to what extent that decision is based on constitutional limitations as opposed to prudential considera-

tions. *See Hotel & Restaurant Employees Union v. Attorney General of the United States*, 804 F.2d 1256, 1261 (D.C.Cir.1986) (separate opinion of Silberman, J.).

crete institutional interests. So did a housing development association whose plans to build a low-income housing project were frustrated by a community's allegedly illegal refusal to rezone property for the project. *Village of Arlington Heights*, 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450. On the other hand, the Court refused to grant standing to an organization that alleged a "special," "longstanding" interest in conserving the beauty and majesty of the Sierra Nevada Mountains as a basis for challenging governmental approval of a development in those mountains. *Sierra Club*, 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636; *see also Simon v. Eastern Kentucky Welfare Rights Organization*, 426 U.S. 26, 40, 96 S.Ct. 1917, 1925, 48 L.Ed.2d 450 (1976) (organization with "special interest in the health problems of the poor" could not assert standing in its own right) (dictum).

This court has consistently interpreted the Supreme Court's teachings with respect to an organization's injury in fact to require more than allegations of damage to an interest in "seeing" the law obeyed or a social goal furthered. *See, e.g., Center for Auto Safety*, 793 F.2d at 1328 n. 41 (damage to institution's interest in fuel conservation not injury in fact); *Community Nutrition Institute v. Block*, 698 F.2d 1239, 1253–54 (D.C.Cir.1983) (damage to organization's interest in "seeing that consumers have ... dairy products available at the lowest possible price" insufficient to constitute injury in fact), *rev'd on other grounds*, 467 U.S. 340, 104 S.Ct. 2450, 81 L.Ed.2d 270 (1984); *see also Capital Legal Foundation v. Commodity Credit Corp.*, 711 F.2d 253, 259 (D.C.Cir.1983). The organization must allege that discrete programmatic concerns are being directly and adversely affected by the defendant's actions. *See, e.g., Action Alliance of Senior Citizens v. Heckler*, 789 F.2d 931, 936–39 (D.C. Cir.1986) (standing granted to organization whose counselling and advocacy services were diminished by regulations improperly limiting flow of information concerning age discrimination); *Scientists' Institute for Public Information, Inc. v. AEC*, 481 F.2d 1079, 1087 n. 29 (D.C.Cir.1973) (organiza-

tion that informed public of significant scientific issues had standing to challenge AEC's decision not to issue environmental impact statement).

ALF's allegations fall short of the requirements for injury in fact elaborated in the decisional law. ALF's allegation of an "institutional interest" in "seeing to it that the Commission's [policies] are enforced" is almost identical to allegations this court has previously found wanting. *See Center for Auto Safety*, 793 F.2d at 1328 n. 41; *Community Nutrition Institute*, 698 F.2d at 1253–54; *see also Simon*, 426 U.S. at 40, 96 S.Ct. at 1925.

In sum, we are persuaded that ALF is unable to establish standing in its institutional capacity in this case. We find ourselves unable to discern how any discrete activities ALF might undertake as a "media watchdog" group could suffer in a manner that ALF could fairly trace to the FCC's decision not to initiate an investigation in this case. *See Community Nutrition Institute*, 698 F.2d at 1254; *see also Simon*, 426 U.S. at 40, 96 S.Ct. at 1925. This is, we are constrained to conclude, not a case in which ALF can satisfy standing requirements if afforded "an opportunity to make more definite the allegations of the complaint." *Havens Realty*, 455 U.S. at 377–78, 102 S.Ct. at 1124. Its petition for review is therefore

*Dismissed.*