**FRIENDS OF TILDEN PARK, INC., Appellant,**

v.

**DISTRICT OF COLUMBIA and Clark Realty Capital, LLC, Appellees.**

**Nos. 00–CV–1560, 01–CV–376.**

District of Columbia Court of Appeals.

Argued May 23, 2002.
Decided Sept. 19, 2002.

Lawrence M. Levine, with whom Hope M. Babcock and Andrea C. Ferster, Washington, DC, were on the brief, for appellant.

Donna M. Murasky, Assistant Corporation Counsel, with whom Robert R. Rigsby, Corporation Counsel at the time, and Charles L. Reischel, Deputy Corporation Counsel, were on the brief, for appellee District of Columbia.

Roger J. Marzulla, with whom Nancie G. Marzulla, Washington, DC, was on the brief, for appellee Clark Realty Capital, LLC.

Before FARRELL, RUIZ, and GLICKMAN, Associate Judges.

GLICKMAN, Associate Judge.

This appeal turns on the question of an organization's standing to maintain a lawsuit. Friends of Tilden Park, Inc. ("Friends") is a District of Columbia non-profit corporation formed in May of 2000 for "educational, charitable and social" purposes, according to its articles of incorporation, "including the organization of people interested in the development and preservation of the North Cleveland Park neighborhood." Notwithstanding this stated purpose, Friends is not a membership organization. Its articles of incorporation specifically prohibit Friends from having members. Friends is governed by a self-perpetuating board of directors. The articles of incorporation require a majority of the directors to reside in the District of Columbia, and provide that "at least two of the directors shall reside within the area bounded by Reno Street [sic] on the west, Van Ness Street on the north, Rock Creek Park on the east and Porter Street on the south." The initial board comprised three members, all of whom resided in the area thus delineated.

Friends was formed in reaction to the construction by Clark Realty Capital, LLC ("Clark") of a nine-story apartment building at 3883 Connecticut Avenue, N.W., a site that is within the North Cleveland Park area described in Friends' articles of incorporation.[1] Friends eventually sued

---

1. An affidavit filed in this case by Friends' president described the organization's origin as follows:

Outraged at Clark's refusal to provide copies of any documents showing the environmental impacts of the project and the lack of public input[, a] group of neighbors joined to form a non-profit organization called Friends of Tilden Park that would help communities to take [an] active role in neighborhood developments and protect their environment.

Clark and the District of Columbia in Superior Court to enjoin the construction on the ground that the District should have required Clark to prepare an Environmental Impact Statement ("EIS") for the project pursuant to the District of Columbia Environmental Policy Act ("DCEPA"), D.C.Code § 8–109.01 *et seq.* (2001).

The Superior Court denied Friends' motion for preliminary injunctive relief, and thereafter granted summary judgment to Clark and the District of Columbia. Although the motions judge granted summary judgment on the merits, Clark also had contested Friends' standing to maintain the action and the motions judge had expressed her doubts about Friends' standing. Friends has appealed to this court from both the denial of a preliminary injunction and the entry of summary judgment. On the threshold question of standing, Friends contends, as it did in its complaint, that it has the requisite standing to sue "on behalf of itself and its adversely affected members."

We disagree. Friends has no standing to sue on its own behalf because it suffered no injury or threatened injury. Friends has no standing to sue in a representational capacity because it has no members and no one whom it represents. We remand to permit the entry of an order dismissing Friends' complaint for lack of standing. We therefore do not reach the merits of its appeals.

## I.

The legal wrangling surrounding Clark's erection of an apartment building at 3883 Connecticut Avenue, N.W., began in August 2000, when Friends commenced its first action in Superior Court to enjoin construction. Charging that the construction threatened environmental harm to nearby Rock Creek Park, Friends identified material omissions and misstatements in the Environmental Impact Screening Form ("EISF") that Clark had submitted to the District of Columbia government to secure its building permit.

Prompted by Friends' complaint, the Building and Land Regulation Administration of the District of Columbia Department of Consumer and Regulatory Affairs ("DCRA") issued a stop work order, halting construction at 3883 Connecticut Avenue until the District reevaluated its environmental impact. Friends thereupon voluntarily dismissed its lawsuit without prejudice pursuant to Super. Ct. Civ. R. 41(a)(1)(i). Clark submitted a revised and corrected EISF. DCRA convened a public meeting at which it received the views of interested parties on the environmental effects of the Clark project. Both Friends and the National Park Service (which oversees Rock Creek Park) participated in the public meeting. At DCRA's direction, Clark supplemented its EISF with an engineering report that addressed several potential environmental concerns.

DCRA referred Clark's revised EISF to the Environmental Health Administration of the District of Columbia Department of Health ("DOH") for evaluation. DOH ultimately issued an environmental assessment report recommending that Clark submit either an EIS or a plan to mitigate what DOH termed the "potential large impacts" of the construction on surface and underground water in the vicinity of the project. *See* D.C.Code § 8–109.03(a) (requiring preparation of an EIS if a "major action ... is likely to have substantial negative impact on the environment, if implemented"). DCRA accepted this recommendation and notified Clark that it would order an EIS "to evaluate the full impact" of the project unless Clark revised its project to address DOH's specific concern.

Seeking to avoid the delay, expense and difficulty of preparing a full-scale EIS, *see* D.C.Code § 8–109.03(a) (listing what an

EIS must include), Clark submitted a mitigation plan. The mitigation plan described Clark's proposals for protecting a groundwater seep on the construction site, "dewatering" the excavation during the construction process, and maintaining groundwater flow once construction was completed. DOH conditionally approved the plan, subject to reporting and other requirements which Clark readily accepted. Based on DOH's approval, DCRA determined that Clark's construction of an apartment building at 3883 Connecticut Avenue was "not likely to have substantial negative impact on the environment" and did not need an EIS. DCRA then rescinded its stop work order, allowing Clark to resume its construction activities.

Upon learning of DCRA's decision, Friends filed a new complaint in Superior Court on November 27, 2000, to enjoin construction at 3883 Connecticut Avenue on the ground that an EIS was required by the DCEPA. In this complaint, Friends described itself as "a nonprofit organization incorporated under the laws of the District of Columbia to protect and preserve the historic and natural resources and quality of life in North Cleveland Park." Friends alleged that it sued on behalf of itself and "its adversely affected members [who] reside in the immediate vicinity of the proposed new apartment building, and use, enjoy, and derive benefit from the nearby Rock Creek Park, Melvin Hazen Trail, and the mature trees, plants, and wildlife that currently occupy the site." Friends alleged that its members' "use, enjoyment, and appreciation of these resources will be threatened and adversely

affected by" the District's decision to permit Clark to build without first submitting an EIS.[2] That decision, Friends further alleged, would cause "irreparable injury to Plaintiff and the natural resources and environment that Plaintiff (and the DCEPA) seek to protect." Friends sought a temporary restraining order, which was issued, and a preliminary injunction.

On December 7, 2000, after holding a hearing, the motions judge denied preliminary injunctive relief. In a comprehensive memorandum opinion, the motions judge ruled that Friends had shown neither a substantial likelihood of success on the merits of its claim nor irreparable injury as a consequence of DCRA's decision to permit Clark to proceed without an EIS. Regarding the latter point, the judge found that the evidence did not support Friends' claims of irreparable harm to the environment. The judge also found that notwithstanding the allegations of its complaint, Friends in fact had no members and had "fail[ed] to demonstrate that it, as a corporate entity without members, could be harmed, let alone irreparably harmed, by the proposed project." "Indeed," the judge observed, "it is unclear whether plaintiff has legal standing to raise the instant claims inasmuch as it does not appear to represent any persons." Friends took a timely appeal from this ruling.[3]

Thereafter, in January and February of 2001, the District of Columbia and Clark filed motions to dismiss or for judgment on the pleadings or, alternatively, for summary judgment. The District argued that

2. The complaint charged that "[t]he project abuts federally-owned park land and the Melvin Hazen Stream, a tributary of Rock Creek, will result in erosion to the parkland, siltation to the park's underground stream and wetlands, the destruction of dozens of mature trees, adverse impacts to wildlife habitat (including habitat of the Hays Spring Amphipod,

a federally listed endangered species), and will generate increased traffic and attendant air pollution."

3. After issuing a temporary stay, this court denied Friends' motion for an injunction pending appeal and expedited the appeal.

DCRA's decision not to require an EIS was supported by substantial evidence and did not violate the DCEPA. Clark raised that and other grounds, including lack of jurisdiction, failure to exhaust administrative remedies, and Friends' lack of standing to pursue the action given that it had no members. Clark supported its standing argument with a copy of Friends' articles of incorporation, which stated specifically that "[t]he Corporation shall have no members." Friends filed no opposition to either motion. At a subsequent status hearing, counsel for Friends explained that "we no longer have the resources to continue to file pleadings in both [the Superior Court] and the pending action in the Court of Appeals [i.e., the appeal from the denial of a preliminary injunction]."

On March 2, 2001, the motions judge issued separate orders granting summary judgment in favor of the District of Columbia and Clark. Each order stated without further explanation that the defendant's motion for summary judgment was granted "for the reasons stated in the memorandum of points and authorities in support thereof." The orders did not address specifically the question of Friends' standing to sue. This court consolidated Friends' appeal from the entry of summary judgment against it with its earlier appeal from the denial of preliminary injunctive relief.

## II.

Friends argues for reversal on two principal grounds: first, that the District had no authority under the DCEPA to adopt the mitigation measures that Clark proposed in lieu of requiring Clark to prepare an EIS; and second, that the District failed to take a sufficiently "hard" look at the environmental impact of the Clark project. Friends also contends that it satisfied all the requirements for preliminary injunctive relief. The District of Columbia and Clark argue that we should not reach these contentions because Friends, as a nonprofit corporation with no members, does not have standing to maintain the present action. Clark argues in addition that Friends' appeals have become moot because Clark has nearly completed its building at 3883 Connecticut Avenue and the environmental impacts that would be studied in an EIS have been mitigated.

We decide this appeal on the question of standing. Friends argues that it has standing to sue both in its own right and as the representative of its "supporters." We disagree, and therefore do not reach the other issues raised by the parties.[4]

### A. Basic Principles of Standing

Congress did not establish this court under Article III of the Constitution, but we nonetheless apply in every case "the 'constitutional' requirement of a 'case or controversy' and the 'prudential' prerequisites of standing." *Speyer v. Barry*, 588 A.2d 1147, 1160 (D.C.1991); *see also* D.C.Code § 11–705(b) (2001) (stating that divisions of this court hear and determine "cases and controversies"). In enforcing these requirements, we " 'look to' federal standing jurisprudence, [both] constitutional and prudential." *Speyer*, 588 A.2d at 1160 (summarizing *Community Credit Union Servs., Inc. v. Federal Express Servs. Corp.*, 534 A.2d 331, 333 (D.C.1987)).

The *sine qua non* of constitutional standing to sue is an actual or imminently threatened injury that is attrib-

---

**4.** We reject Friends' invitation to remand this case for further development of the record on the issue of its standing. Friends has already had the opportunity to make its record on that issue in response to Clark's summary judgment motion. It has contended in this court that the "undisputed record contains sufficient evidence of Friends' standing to seek redress of several different injuries to itself and its supporters."

utable to the defendant and capable of redress by the court. *See Speyer,* 588 A.2d at 1160.[5] The plaintiff, or those whom the plaintiff properly represents, "must have suffered an injury in fact-an invasion of a legally protected interest which is (a) concrete and particularized, . . . and (b) actual or imminent, not conjectural or hypothetical." *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (internal quotation marks, citations and footnote omitted). "[A] mere 'interest in a problem,' no matter how longstanding the interest and no matter how qualified the organization is in evaluating the problem, is not sufficient by itself to render the organization 'adversely affected' or 'aggrieved' [for standing purposes]." *Sierra Club v. Morton,* 405 U.S. 727, 739, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972). Similarly, "[t]he mere fact that an organization redirects some of its resources to litigation and legal counseling in response to actions or inactions of another party is insufficient to impart standing upon the organization." *National Taxpayers Union, Inc. v. United States,* 314 U.S.App. D.C. 377, 383, 68 F.3d 1428, 1434 (1995) (quoting *Association for Retarded Citizens v. Dallas County Mental Health & Mental Retardation Ctr.,* 19 F.3d 241, 244 (5th Cir.1994)). But a "concrete and demonstrable injury to the organization's activities" is enough for standing whether the injury is economic or non-economic. *Havens Realty Corp. v. Coleman,* 455 U.S. 363, 379, 102 S.Ct. 1114, 71 L.Ed.2d 214 (1982) (holding that a fair housing organization has suffered injury in fact for

standing purposes if racially discriminatory steering practices of defendant realty corporation "perceptibly impaired" the organization's ability to provide counseling and referral services to low- and moderate-income home-seekers by requiring it to devote significant resources to identify and counteract such practices).

■ An organizational plaintiff such as Friends may have standing to sue on behalf of its members as well as on its own behalf. *See Sierra Club,* 405 U.S. at 739, 92 S.Ct. 1361. "[A]n association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Washington State Apple Adver. Comm'n,* 432 U.S. 333, 343, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977). At least the first of these three conditions of associational standing is inherent in the constitutional "case and controversy" requirement. *See United Food & Commercial Workers Local 751 v. Brown Group, Inc.,* 517 U.S. 544, 555–56, 116 S.Ct. 1529, 134 L.Ed.2d 758 (1996).

## B. Associational Standing

■ In the usual case "brought by an organization claiming that an agency improperly refused to prepare [or require] an environmental impact statement . . . standing is established derivatively, through the organization's members."

5. In addition, under the so-called prudential principles of standing, "a plaintiff may assert only its own legal rights, may not attempt to litigate 'generalized grievances,' and may assert only interests that 'fall within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question.'" *Community Credit Union,* 534 A.2d at

333 (quoting *Valley Forge Christian College v. Americans United for Separation of Church & State, Inc.,* 454 U.S. 464, 474–75, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982) (internal quotation marks omitted)). We have no need to address these additional standing principles in this appeal.

*Foundation on Economic Trends v. Lyng,* 291 U.S.App.D.C. 365, 369, 943 F.2d 79, 83 (1991). Friends initially asserted in Superior Court that it had standing to sue on behalf of its members, whom it described as persons residing in the vicinity of 3883 Connecticut Avenue who recreate in and enjoy the benefits of nearby Rock Creek Park. We do not doubt that if Friends had such members, it would have standing as their representative to maintain an action challenging the District's failure to require Clark to prepare an EIS. "The procedural injury implicit in agency failure to prepare [or require] an EIS—the creation of a risk that serious environmental impacts will be overlooked—is itself a sufficient 'injury in fact' to support standing, provided this injury is alleged by a plaintiff having a sufficient geographical nexus to the site of the challenged project [to] expect [ ] to suffer whatever environmental consequences the project may have." *Sabine River Auth. v. Texas Water Conservation Assoc.,* 951 F.2d 669, 674 (5th Cir.1992) (citation omitted); *accord, Lujan,* 504 U.S. at 572 & 572 n. 7, 112 S.Ct. 2130; *Sierra Club,* 405 U.S. at 735, 92 S.Ct. 1361. The environmental interests of persons living near Clark's construction site are "germane" to Friends' organizational purpose, and their individual "participation" is not essential to Friends' lawsuit. *See Hunt,* 432 U.S. at 343, 97 S.Ct. 2434.

The persons whom Friends claims to represent are not its members, however. By the terms of its articles of incorporation, Friends has no members. Confronted with this inconvenient fact, Friends argues in this court that it nonetheless has standing to sue as the representative of its "supporters" among the neighborhood residents whose environmental interests are at stake. These supporters, Friends suggests, are its *de facto* if not its *de jure* members. The record, though, does not bear out this claim.

While Friends has never identified them with specificity, we accept that it does have at least some supporters who would have standing in their own right to sue the District and Clark over the failure to prepare an EIS for the construction project at 3883 Connecticut Avenue. The record discloses that three area residents incorporated Friends and formed its initial board of directors. One of the incorporators is the president of Friends. He and two other residents of the immediate neighborhood-one of them a new member of Friends' board-furnished affidavits regarding the impact of the construction project in support of Friends' motion for a preliminary injunction. It is fair to consider these persons as supporters of Friends and its lawsuit.

The question, though, is whether such supporters are equivalent to members for representational purposes. For guidance in answering this question, we look to the Supreme Court's analysis of a similar question in *Hunt,* 432 U.S. at 344–45, 97 S.Ct. 2434. The organization in that case was a commission created by the State of Washington to protect and promote the interests of the state's apple industry. The Court held that while this commission did not have members *per se,* it had standing to assert the claims of Washington apple growers and dealers in a lawsuit challenging a North Carolina law that discriminated against Washington apples. *See id.* at 345, 97 S.Ct. 2434. First, the Court noted that "for all practical purposes" the commission functioned as a traditional trade association serving "a specialized segment of the State's economic community which is the primary beneficiary of its activities." *Id.* at 344, 97 S.Ct. 2434. Second, while they were not designated "members" of the commission, the state's apple growers and dealers possessed "all of the indicia of membership." *Id.* They alone served on the commission,

elected its members, and financed its activities, including the lawsuit which the commission brought on their behalf. "In a very real sense," the Court found, "the Commission represents the State's growers and dealers and provides the means by which they express their collective views and protect their collective interests." *Id.* at 345, 97 S.Ct. 2434. Finally, the Court noted, there was a "financial nexus" between the litigation interests of the commission and its grower and dealer constituents; for if the legal challenge to the discriminatory North Carolina law failed, the resulting reduction in constituent revenues from sales of Washington apples would be reflected in a corresponding reduction in the annual assessments that the growers and dealers paid to the commission. *Id.* Taking these considerations into account, the Court stated that "it would exalt form over substance to differentiate between the [commission] and a traditional trade association representing the individual growers and dealers who collectively form its constituency." *Id.* Consequently, the Court held, the commission had standing to sue in a representational capacity.

It is no small matter for an organization to assert the right to sue, not on behalf of itself, but on behalf of others. We take from *Hunt* that such a right requires the representational relationship to be a strong one, in order to ensure the fidelity of the organization to those for whom it claims to speak. The substance of an association-member relationship is more important than the form, but *Hunt* teaches that the substance must be present. The Circuit Court of Appeals reached much the same conclusion in *American Legal Found. v. Federal Communications Comm'n,* 257 U.S.App.D.C. 189, 808 F.2d 84 (1987). In that case the American Legal Foundation (ALF), a nonprofit media law center with no members, petitioned for review of an FCC decision not to investi-

gate its fairness complaints against the American Broadcasting Companies (ABC). ALF claimed standing to sue as the representative of regular ABC News viewers who agreed with its complaints, some of whom furnished affidavits reciting that ALF represented their viewing interests. *See id.,* 257 U.S.App.D.C. at 193, 808 F.2d at 88. Following *Hunt,* the D.C. Circuit rejected this claim of representational standing because ALF's relationship to its "supporters" bore "none of the indicia of a traditional membership organization." *Id.,* 257 U.S.App.D.C. at 195, 808 F.2d at 90. ALF "serve[d] no discrete, stable group of persons with a definable set of common interests;" its "constituency of supporters [was] completely open-ended." *Id.* ALF's supporters did not "play any role in selecting ALF's leadership, guiding ALF's activities, or financing those activities." *Id.* Moreover, the court perceived "no linkage between ALF's interest in the outcome" of the litigation and the interests of its supporters. *Id.* In short, ALF was not the "functional equivalent of a traditional membership organization," *id.,* and the court declined to permit it to "premise standing on the fact that it ha[d] located certain individuals who agree[d] with its complaint." *Id.,* 257 U.S.App.D.C. at 194, 808 F.2d at 91.

Clark's summary judgment motion contested Friends' standing on the ground that its articles of incorporation precluded it from having members. Friends bore the burden of establishing in response that it had at least a *de facto* membership relationship with the "supporters" whom it claimed to represent. Friends did not shoulder that burden. A "supporter" is not the same as a "member," and a supportive relationship is not the functional equivalent of a membership association. Friends made no effort to show that the amorphous population of its "supporters" in the North Cleveland Park neighborhood

constituted a "specialized segment of the ... community," *Hunt,* 432 U.S. at 344, 97 S.Ct. 2434, or a "discrete, stable group of persons with a definable set of common interests," *American Legal Found.,* 257 U.S.App.D.C. at 195, 808 F.2d at 90. More important, the "indicia of membership" to which the Supreme Court looked in *Hunt* are absent here, as Friends' putative supporters have no power to elect its directors (or its officers), need not make up even a majority of its governing board, and—so far as the record shows—do not fund its activities generally or the present litigation specifically. Friends presented no evidence that its supporters guide its actions or have control over the organization. Nor did Friends present evidence of a "financial nexus," *Hunt,* 432 U.S. at 345, 97 S.Ct. 2434, between itself and its supporters.

We cannot uphold Friends' associational standing on the theory that it is merely a representative of its directors and is suing to vindicate their interests. Friends has not claimed that it is only an association of, by and for its directors, created to serve their specific interests and suing only on their behalf. Absent some such claim with support in the record, we cannot treat the corporation for standing purposes as though it were just its directors' mouthpiece. To do that we would have to ignore the potential for conflict between the directors' personal interests and the interests of the organization that the directors are obliged to pursue. It is true that if a nonprofit corporation has no members, its directors have all of the authority of members and may take any action that members would be permitted to take. *See* D.C.Code § 29–301.16(d) (2001). But as the managers of a nonprofit corporation's affairs, *see* D.C.Code § 29–301.02(7), directors are conceptually different from members in a critical respect. The directors "owe their fiduciary duties to the corporation." *Fletcher Cyc. Corp.*

§ 844.10; *see also Wisconsin Ave. Assocs., Inc. v. 2720 Wisconsin Ave. Coop. Ass'n,* 441 A.2d 956, 963 (D.C.1982) ("The fiduciary concept is not limited to stock corporations but applies to membership organizations as well."). The directors "must act in the utmost good faith, and this good faith forbids placing [themselves] in a position where [their] individual interest clashes with [their] duty to the corporation." *Fletcher Cyc. Corp.* § 837.50. The directors' fiduciary obligation to a corporation means that they must manage the corporation solely in its best interest, not as a vehicle for promoting their personal beliefs or causes.

We conclude that Friends did not meet its burden to establish that it has standing to seek redress for the injuries suffered by its supporters. We turn to Friends' contention that it has standing to sue for injuries that it suffered itself.

### C. Organizational Standing

In asserting standing to sue on its own behalf, Friends does not claim that the Clark construction project threatens its own institutional use or enjoyment of the environment around the building site. Rather, Friends claims that the District's decision not to require Clark to prepare an EIS caused it two other kinds of injury sufficient in themselves to support standing to sue: so-called "procedural" and "informational" injury.

### 1. Procedural Injury

Friends contends that it suffered a "procedural injury" when the District, allegedly in contravention of the DCEPA, rescinded Clark's stop work order without requiring Clark to prepare an EIS. Friends is vague about the specific procedural rights it claims to have lost. However, the DCEPA provides for public review and comment when an EIS is prepared, and for a public hearing if there is suffi-

cient interest, *see* D.C.Code § 8–109.03(b). An entity such as Friends presumably could participate in any of these proceedings. We shall assume, therefore, that the District's failure to require an EIS did deprive Friends of a procedural right that it could have exercised had there been an EIS. *See Speyer,* 588 A.2d at 1162 (upholding neighbors' standing to challenge District's failure to apply for a certificate of need for a residential treatment center because the consequent "denial of the [statutory] right to attend and participate in the [agency] proceedings [on the application] constitutes an independent and legally sufficient injury."). Friends asserts that the deprivation of its procedural right created the risk that environmental damage would go undiscovered and thereby "caused injury to the very mission and purpose of Friends."

■ When the Supreme Court considered procedural injury as a basis for standing, it recognized that "[t]here is this much truth to the assertion that 'procedural rights' are special: The person who has been accorded a procedural right to protect his concrete interests can assert that right without meeting all the normal standards for redressability and immediacy." *Lujan,* 504 U.S. at 572 n. 7, 112 S.Ct. 2130. But the Court rejected the notion that a statute purporting to allow "any person" to commence a lawsuit to challenge an agency's failure to comply with procedural requirements afforded standing to sue "notwithstanding [the person's] inability to allege any discrete injury flowing from that failure." *Id.* at 572, 112 S.Ct. 2130. Instead, the Court said, a party "assuredly can" enforce procedural rights "so long as the procedures in question are designed to protect some threatened concrete interest of [the party] that is the ultimate basis of [the party's] standing." *Id.* at 573 n. 8, 112 S.Ct. 2130.

■ By way of illustration, the Court said that a plaintiff has standing to enforce the procedural requirement for an environmental impact statement if "a separate concrete interest" of the plaintiff was threatened—as where the plaintiff is a person who lives "adjacent to the site" of a construction project that is subject to the EIS requirement. *Id.* at 572 & n. 7, 112 S.Ct. 2130. In contrast, plaintiffs who have no concrete interest at stake, such as "persons who live (and propose to live) at the other end of the country" from the project, do not have standing to enforce the EIS requirement in court. *Id.* at 572 n. 7, 112 S.Ct. 2130. *Accord, Sabine River Auth.,* 951 F.2d at 674 (stating that procedural injury from failure to prepare an EIS can support standing provided that the plaintiff has "a sufficient geographical nexus to the site of the challenged project" to suffer its environmental consequences). It follows that "in reviewing an EIS claim, a court must examine whether the demonstrably increased risk of serious environmental harm shown actually threatens the plaintiff's particular interests before that plaintiff may have a particularized injury sufficient for standing." *Florida Audubon Soc'y v. Bentsen,* 320 U.S.App.D.C. 324, 333, 94 F.3d 658, 667 (1996) (en banc).

Despite the foregoing precedent, Friends contends that our pre-*Lujan* decision in *Speyer, supra,* stands for the proposition that "a procedural injury *alone* is sufficient to establish standing under District law" regardless of any threat to a separate concrete interest of the would-be plaintiff. We do not agree with that reading of *Speyer,* for no such proposition was at issue in the case. The procedural injury in *Speyer* was the deprivation of the plaintiffs' statutory right to oppose the issuance of a Certificate of Need (CON) for a residential treatment center for emotionally disturbed children. *Id.,* 588 A.2d at 1161–62. As this court took care to

note, the denial of that right affected the plaintiffs' interests because they resided in the neighborhood in which the treatment center was to be located. *See id.* at 1161. Specifically, plaintiffs claimed that the treatment center threatened their interests in "neighborhood tranquillity, property values, public safety and traffic congestion," *id.* at 1160. *Speyer* neither holds nor implies that a plaintiff whose interests are not concretely "affected" by the denial of a procedural right would nonetheless have standing to challenge that denial in court.

By itself, therefore, the loss of an entitlement to participate in agency evaluation of an EIS does not constitute sufficient "injury in fact" to support standing to sue. The issue remains whether Friends as an entity had some other concrete interest at stake. Friends' ancillary assertion that its inability to weigh in on an EIS jeopardized its "very mission and purpose" does not identify such an interest, for as the Supreme Court said, a "special interest" in a subject is not enough for standing. *Sierra Club,* 405 U.S. at 739, 92 S.Ct. 1361. We are left to consider Friends' claim that it sustained "informational injury."

## 2. Informational Injury

"Informational injury" is a claim that Friends raises with particularity for the first time on appeal. Friends posits that the District's failure to order Clark to prepare an EIS "deprived Friends of information necessary to fulfill its organizational purpose, which is to educate the community about the environmental impacts of Clark's project." As Friends did not advance this argument in the Superior Court, we would be justified in disregarding it altogether. *See, e.g., Barrera v. Wilson,* 668 A.2d 871, 872 (D.C.1995). To the extent, however, that the specific informational injury claim is subsumed within Friends' general claim of interference with

its mission, we think it suffices to say the following.

▮▮▮ To begin with, the concept of "informational injury" that Friends advances for standing purposes is an elusive one. It is true that the statutory requirement of an EIS is "informational" in nature. If the District determines that a proposed "major action" is "likely to have substantial negative impact on the environment, if implemented," the proponent of the action must prepare an EIS describing and analyzing the impact. D.C.Code § 8-109.03(a). The District then must make the EIS available for public comment. *See* D.C.Code § 8-109.03(b). These provisions, however, do not confer on any and every person who happens to be interested an enforceable legal right—i.e., standing—to require preparation of an EIS merely upon a showing that the statutory conditions are met. In that respect, the DCEPA is unlike either a freedom of information statute that entitles any person with an interest in doing so to obtain government documents that are already in existence, or a statute that entitles any person to particular information upon request. *Cf. Havens Realty Corp.,* 455 U.S. at 373-74, 102 S.Ct. 1114 (where statute confers on all persons an enforceable legal right to receive truthful information about available housing, "testers" posing as interested renters or purchasers who are given false information about housing availability suffer actual injury and have standing to sue for damages). If not everyone, then who is entitled to assert the deprivation of an ability to disseminate EIS information as a basis for standing to sue?

The basic requirement of constitutional standing is a concrete and particularized injury in fact. For the inability of an organization to disseminate an EIS to amount to such an injury in the absence of a statutory entitlement to the document, it

therefore is not enough that the organization has a "special interest," *Sierra Club*, 405 U.S. at 739, 92 S.Ct. 1361, in the environment or in informing its members or supporters about environmental matters. If the threshold were set that low, virtually any plaintiff would be able to surmount it. *See Foundation on Economic Trends v. Lyng*, 291 U.S.App.D.C. 365, 370, 943 F.2d 79, 84 (1991) (observing that such a "broad approach .... would potentially eliminate any standing requirement in NEPA cases, save when an organization was foolish enough to allege that it wanted the information for reasons having nothing to do with the environment"); *accord, Competitive Enter. Inst. v. National Highway Traffic Safety Admin.*, 284 U.S.App. D.C. 1, 16, 901 F.2d 107, 122 (1990) ("To show injury-in-fact, an organization must allege more than a mere 'setback to [its] abstract societal interests.' ") (quoting *Havens*, 455 U.S. at 378–79, 102 S.Ct. 1114).

*Havens*, 455 U.S. at 379, 102 S.Ct. 1114, suggests that at a minimum, the organization "must point to concrete ways in which [its] programmatic activities have been harmed" by its inability to disseminate the information in an EIS for such "informational harm" to give rise to standing. *Competitive Enter. Inst.*, 284 U.S.App.D.C. at 17, 901 F.2d at 123. The Circuit Court of Appeals added, in what appears to be a more restrictive formulation, that "[a]llegations of injury to an organization's ability to disseminate information may be deemed sufficiently particular for standing purposes where that information is essential to the injured organization's activities, and where the lack of the information will render those activities infeasible." *Id.*, 284 U.S.App.D.C. at 16, 901 F.2d at 122; *accord, Animal Legal Defense Fund v. Espy*, 306 U.S.App.D.C. 188, 194–95, 23 F.3d 496, 502–03 (1994).

In the Superior Court, Friends did not respond to Clark's challenge to its standing by pointing to concrete ways in which its programmatic activities had been harmed by the District's failure to order an EIS. See note 4, *supra*. The record does not show such harm. Perhaps Friends' efforts to educate and organize its neighbors to protect environmental values in North Cleveland Park *might* be enhanced if Friends could disseminate the information that an EIS would contain, but informational standing requires more. It is not evident that the feasibility of Friends' organizing efforts is affected materially by the unavailability of an EIS. To the contrary, though it is not necessarily dispositive of the issue, is the fact that the record already contains a good deal of information, some of it developed by Friends itself, concerning the potential environmental impact of construction at 3883 Connecticut Avenue. Moreover, as shown by the reaction to its first lawsuit, Friends has proven itself adept at attracting public scrutiny to that project. We cannot conclude that Friends' inability to disseminate an EIS to its supporters constituted an injury in fact that might serve as a basis for standing.

### III.

For the foregoing reasons, we vacate the orders entering summary judgment in favor of the District of Columbia and Clark, and remand with directions to dismiss Friends' complaint for want of standing.

*Vacated and remanded.*